# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAREMARK, L.L.C., CAREMARKPCS, L.L.C., CAREMARK IPA, L.L.C., SILVERSCRIPT INSURANCE COMPANY, and AETNA, INC.,<br><br>Petitioners,<br><br>v.<br><br>NEW YORK CANCER & BLOOD SPECIALISTS,<br><br>Respondent. | CASE NO. |

## MEMORANDUM IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD

Caremark, L.L.C., CaremarkPCS, L.L.C., Caremark IPA, L.L.C. (together, "Caremark"), SilverScript Insurance Company ("SilverScript"), and Aetna, Inc. ("Aetna") (together, "Petitioners"), in accordance with section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, submit this memorandum in support of their petition to vacate the arbitration award (the "Award") issued on September 19, 2023, by arbitrators Michael J. Jordan, Brendan M. Hare, and Louise Zeuli (together, the "Panel"), in the arbitration titled *New York Cancer & Blood Specialists v. Caremark, LLC, et al.*, AAA Case No. 01–21–0016–4612.

### INTRODUCTION

Petitioners request that this Court vacate an arbitration award that manifestly disregarded the most basic principles of contract law by allowing a windfall recovery completely untethered to the parties' expectations and granting "equitable" damages for ***both*** breach of contract and unjust enrichment, a legal impossibility prohibited by hornbook contract law.

For the last seven years, Claimant New York Cancer and Blood Specialists ("NYCBS") agreed to contracts with Caremark that imposed performance fees within a set 2% range (e.g., 3% to 5%) assessed on NYCBS's Medicare Part D prescription-claim volume. Under this arrangement, high-performing dispensaries would pay fees at the low end of the range (e.g., 3%), and poor-performing dispensaries would pay fees at the high end (e.g., 5%). In no scenario would the fees ever be zero. In other words, the best possible outcome for NYCBS under the parties' contracts, and the maximum contract damages available, would have been the lowest end of the fee ranges (i.e., $ 2,627,640.08).

Instead of adhering to the parties' actual contracts, the Panel disregarded them and awarded NYCBS 100% of its fees (i.e., $17,082,162) based on the Panel's perception of what was "just and equitable." This damages award exceeded the bounds of the contracts and gifted NYCBS a substantial windfall that was not contractually possible.

To arrive at this windfall, the Panel ignored that a party cannot recover on a claim of unjust enrichment when a written contract governs the parties' relationship. Ignoring this fundamental tenet, the Panel held that "the PNR fees were assessed in a manner that unjustly enriched Respondents. . . . [T]he failure of consideration relates directly to [Caremark's Performance Network Program ("PNP")] and the amount of unjust enrichment is easily quantified." Ex. 23, Award, at 31. This ruling simply is not possible under the law. Because the parties admitted that contracts existed between them, the Panel had no ability to ignore the contracts and award damages based on unjust enrichment.

The Panel also ignored that NYCBS, which is not a pharmacy but a dispensing practitioner, is not even covered by the Medicare Act's Any Willing Pharmacy Law ("AWPL"). Despite the absence of coverage, the Panel determined that the AWPL gave it authority to sit in judgment on

whether the terms of contract were fair rather than on whether they were actually breached. This ruling violated public policy and manifestly disregarded the law.

Petitioners acknowledge that courts defer to arbitrators' factual and legal determinations. However, in a case like this one, where arbitrators issue an award that ignores the parties' contracts, violates public policy, and ignores applicable law, that deference is not absolute. Here, the Panel (1) exceeded its authority by rewriting the parties' contractual terms and conditions to award windfall damages to NYCBS; (2) violated public policy by finding that NYCBS was a pharmacy covered by the AWPL; and (3) manifestly disregarded the law by (i) ruling that NYCBS could assert a statutory AWPL claim as a contract claim, (ii) concluding that NYCBS was entitled to relief for both its breach-of-contract and unjust-enrichment claims; (iii) awarding damages in violation of the contract and the parties' reasonable expectations; and (iv) consolidating the claims of multiple independent dispensaries into one arbitration. For these reasons, and as discussed in further detail below, the Court should vacate the Award.

## BACKGROUND

### I.      The Medicare Part D Program

Medicare is a federally funded health-insurance program, primarily for the elderly and disabled, established under Title XVIII of the Social Security Act. Ex. 1, 1603:4–12; *see also* 42 U.S.C. § 1395, *et seq.* Part D is a private market-based prescription-drug program in which the costs are shared between the government and private health insurers who offer plans. 42 C.F.R. § 423.4. The insurers are known as Part D plan sponsors ("Plan Sponsors"). *Id.* Under the Medicare Act, these Plan Sponsors contract with the Center for Medicaid and Medicare Services ("CMS") to offer Part D prescription-drug plans to Medicare beneficiaries. *Uhm v. Humana, Inc.*, 620 F.3d 1134, 1138 (9th Cir. 2010).

3

## II.    NYCBS's Contracts with Caremark

Caremark serves as a pharmacy-benefit manager ("PBM") for thousands of clients, including commercial health plans, self-insured employer plans, and, as relevant here, Part D Plan Sponsors like SilverScript and Aetna. Ex. 1, 1402:19–1403:4. As a PBM, Caremark administers prescription-drug benefits for plan members, including Part D beneficiaries, and processes and pays prescription-drug claims made by pharmacies. *See, e.g., Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F. 3d 505, 511 (8th Cir. 2018).

Providers do not typically have a direct contract with most of Caremark's Part D Plan Sponsor clients. Ex. 1, 700:17–701:2, 721:10–21. In most instances, Caremark contracts directly with providers. As part of this contractual arrangement, providers sign a base agreement ("Provider Agreement") with Caremark. Ex. 1, 864:5–22.

NYCBS executed a Provider Agreement with Caremark for each of its dispensaries. Ex. 2, J-362 at 22:24–23:3. Arizona law governs the contractual relationship for certain NYCBS-affiliated dispensaries. Ex. 3, J-32; Ex. 4, J-35 (operative prior to October 7, 2022); Ex. 5, J-48. New York law governs the contractual relationship for the remaining dispensaries. Ex. 6, J-36 (operative after October 7, 2022); Ex. 7, J-39; Ex. 8, J-42; Ex. 9, J-45; Ex. 10, J-51. Each Provider Agreement incorporates by reference the Provider Manual, which is amended from time to time. *See* Ex. 3, J-32 at ¶11. Notably, the Provider Manual requires each dispensary to bring its claims against Caremark on an individual basis, not an aggregate one. J-14, J-58 at ¶15.09 (stating that "all disputes are subject to arbitration on an individual basis, not . . . through any form of consolidated proceedings").

Merely signing the Provider Agreement does not automatically give a provider access to all of Caremark's networks. Rather, to join specific networks, providers agree to Network Enrollment Forms ("NEFs"), which are part of the overall contract between a provider and

4

Caremark. Ex. 1, 726:8–17; Ex. 11, J-366 at 45:12–19; *see also* Group Ex. 12, J-65 to J-110 (NEFs applicable to NYCBS). The NEFs contain the reimbursement terms and conditions for each network. Ex. 1, 302:22–303:5; Ex. 11, J-366 at 54:2–13. Caremark does not require providers to participate in specific networks and leaves it to them to determine which networks to participate in. Ex. 1, 1534:14–25. Approximately 68,000 providers have accepted Caremark's Part D contract offerings. Ex. 1, 1404:8–22; Ex. 13, J-391 at 31:19–23.

By law, if a provider is dissatisfied with a sponsor's proposed reimbursement terms, it may refuse to accept them. *See* 70 Fed. Reg. at 4244 (noting that Part D was "established . . . as a market-based model under which market competition ensures" that beneficiaries receive affordable care and stating that "pharmacies are not required to contract with Part D plans" if they believe that "the discounts they are being asked to offer are too high").

NYCBS had the opportunity to negotiate the terms and conditions of Caremark's Part D networks. While providers such as NYCBS are not required to contract with pharmacy-services administrative organizations ("PSAOs"), many do engage a PSAO to act as their attorney-in-fact. Ex. 1, 278:3–22, 868:4–7; Ex. 2, J-362 at 81:8–11, 82:1–8. Here, NYCBS retained Amerisource Bergen Drug Corporation ("Elevate"), a well-established PSAO serving thousands of providers across the country. Ex. 1, 277:7–10, 277:20–278:2, 868:17–869:9; Ex. 2, J-362 at 83:5–11.

Elevate enrolled NYCBS in Caremark's Part D networks. Ex. 1, 277:11–16, 300:11–23; Ex. 11, J-366 at 69:22–70:5, 83:15–20. In doing so, Elevate negotiated NEF terms with Caremark that were more favorable than what other PSAOs or providers unaffiliated with PSAOs received. Ex. 1, 886:1–18, 886:19–896:21.

## III.   The Performance Network Program

Given the Part D program's use of market forces to provide affordable healthcare to beneficiaries, Plan Sponsors have "maximum flexibility" to structure their standard terms and

conditions, including with respect to reimbursement. 83 Fed. Reg. 16440, at 16589–90 (April 16, 2018) (stating that CMS provides plans with "maximum flexibility" to structure standard terms and conditions); 70 Fed. Reg. 4194, at 4245 (stating that "[h]ow a Part D sponsor nets out negotiated price concessions in its negotiated prices is at the discretion of the Part D sponsor").

As a result of this "maximum flexibility," Caremark offered participating providers the opportunity to participate in the PNP in certain Part D networks beginning in 2016. Performance programs like the PNP have become a staple for all payers in the Part D space. *See, e.g., AIDS Healthcare Found. v. Express Scripts, Inc.*, 2023 WL 2263183, at *8 (E.D. Mo. Feb. 28, 2023) (noting that performance programs in the Part D space are explicitly permitted under CMS guidance and rulemaking). Caremark's PNP is a performance network in which a provider's individual performance can affect its overall reimbursement. Ex. 1, 1254:3–12. The higher a provider scores in the PNP, the better the reimbursement it receives, and vice versa. Ex. 1, 257:8–13, 631:1–12, 1254:13–22.

Under the PNP, a pharmacy's total reimbursement is calculated by the interaction of two component parts: the point-of-sale reimbursement rate paid to the pharmacy based on the AWP discount coupled with the later assessment of pharmacy price concessions through variable network rebates, called performance-network-rebates ("PNR"). *See infra* Background, Part V. The "AWP" discount refers to the "Average Wholesale Price" of a drug minus the percentage dictated by the NEF. Ex. 14, J-58, Definitions at p. 140 (defining "AWP Discount"). For example, AWP minus 15% means that, on a drug with an average wholesale price of $100, the pharmacy receives $85 for this component of its reimbursement. AWP is a standard reimbursement methodology in the pharmacy industry.

Both the point-of-sale and variable-rate components of a pharmacy's total reimbursement are disclosed in the NEFs and in the trimester reports detailing the pharmacy's performance under

the program. Ex. 1, 256:25–257:7, 630:11–15, 877:9–13; Group Ex. 12, J-65 to J-110 (NEFs); Group Ex. 15, J-111 to J-203 (trimester reports). With respect to the variable-rate range, all parties to this litigation, including NYCBS, agree that PNR always fall within a 2% range. The higher a provider scores in the PNP, the lower the variable rate assigned to the provider, and vice versa. Ex. 1, 257:8–13, 631:1–12, 1254:13–22.

Because the point-of-sale reimbursement and network-variable range function together, the point-of-sale reimbursement has gotten more favorable for providers as the variable rates have increased. Ex. 1, 617:13–619:8, 878:15–23, 1625:7–23, 1627:3–1628:8. For years after 2016, certain Caremark networks increased the range of variable fees to pharmacies on an annual basis (e.g., 3–5% to 6–8%). Over the years, Caremark coupled PNR increases with similar improved point-of-sale rates to the pharmacies. *Compare* Group Ex. 12, J-69 (2016 NEF for Network 36) *with* Group Ex. 12, J-96 (2020 NEF for Network 72) (point-of-sale rate changed from AWP minus 14.75% in 2016 NEF to AWP minus 12% in 2020 NEF, reflecting a better point-of-sale rate in 2020 to account for an increase in variable-range fees in 2020).

Unsurprisingly then, all parties, and NYCBS's expert, agreed that the overall reimbursement a provider receives in the PNP is a *combination* of the point-of-sale reimbursement and the network-variable rate. Ex. 1, 306:2–11, 630:6–15, 870:23–871:14, 877:24–878:23; Ex. 11, J-366 at 58:18–23.

The parties' contracts also provide that, if CMS changes its rules, the overall reimbursement will revert to a point-of-sale discount that equals the midpoint of the network-variable range. Ex. 1, 871:15–873:7; Group Ex. 12, J-99 (explaining impact on reimbursement if changes in CMS rules render PNP unenforceable). The midpoint range is the market rate that providers would have received in reimbursement if the PNP had not existed. Ex. 1, 983:9–23, 1440:17–1441:17.

IV.    **NYCBS's Agreement That Caremark's Terms Are Reasonable and Relevant**

NYCBS is a medical practice that provides oncology and hematology treatment, among other specialties. Ex. 1, 273:25–274:4; Ex. 11, J-366 at 16:20–17:15. As part of its practice, NYCBS operates clinics where it also dispenses oncology drugs under its physicians' medical licenses. Ex. 2, J-362 at 14:21–24; *see also* Amicus Brief of NYCBS, et al., 2020 WL 1372777, at *5 (filed on March 2, 2020) (dispensing practitioners "do not hold a pharmacy license" and instead dispense drugs as part of their medical license).

In this role, NYCBS is licensed as a dispensing practitioner, not as a pharmacy. Ex. 1, 1409:12–1410:9; *see also* Ex. 16, J-373 at 31:2–9 (testimony from NYCBS's CFO that NYCBS was not "licensed as a pharmacy"). NYCBS's license precludes it from dispensing nononcological drugs, including drugs that treat hypertension, diabetes, and cholesterol. Ex. 1. 79:9–16, 94:14–17, 110:21–111:19, 137:3–11; *see also* N.Y. Educ. § 6807(2)(a)(9) (authorizing dispensing practitioners who are "not the owner of a pharmacy," or who are "not in the employ of such owner," to fill prescriptions under certain limited circumstances).

Even though NYCBS is not a licensed pharmacy, Caremark permitted NYCBS to participate in Caremark's Part D networks. NYCBS enrolled in these networks as a dispensing practitioner, *not* as a pharmacy. Ex. 1, 78:5–79:8; *see, e.g.,* Ex. 17, J-34 at CMK-NYCBS 5081 (noting that NYCBS was enrolling as dispensing practitioner, not a pharmacy); Ex. 18, J-38 at CMK-NYCBS 5109 (same). As part of this arrangement, NYCBS repeatedly affirmed that Caremark's terms and conditions, including those in the PNP, were "reasonable and relevant" to its business model. Group Ex. 19, J-61 to J-64 (Provider Acknowledgements). Similarly, Elevate— on NYCBS's behalf—also agreed that the terms and conditions in the PNP were reasonable and relevant for NYCBS. *See, e.g.,* Group Ex. 12, at J-100 ("By its enrollment in the Performance

Network Program, Provider also agrees that the terms and conditions of participation herein are reasonable and relevant to the Provider.").

## V.     NYCBS's Participation in the PNP

NYCBS admits that participating in Caremark's networks allows it to fill prescriptions for a large segment of Medicare beneficiaries who have prescription-drug coverage through Caremark's Plan Sponsor clients. Ex. 1, 109:16–24; Ex. 2, J-362 at 51:10–23; Ex. 11, J-366 at 36:22–37:3. As a for-profit organization that has experienced 25% to 30% year-over-year growth from 2016 to the present, Ex. 1, 246:22–247:4, 264:18–23, the significant reimbursement NYCBS has achieved in Caremark's Part D networks has bolstered its profits, Ex. 11, J-366 at 33:16–20.

In total, NYCBS netted revenue of $174,572,208.52 million by participating in Caremark's performance networks from 2016 through the end of April 2023. Ex. 20, Declaration of David Hutchins ("Hutchins Decl.") at ¶¶6–8; Ex. 21, Exhibit 1-A to Hutchins Decl. Although NYCBS originally alleged that Caremark's terms and conditions were unreasonable because NYCBS was losing money for filling claims in Caremark's performance networks, when it became obvious that this claim was frivolous, NYCBS withdrew it. Ex. 22, Jan. 4, 2023, Email from NYCBS's Counsel ("[NYCBS] has agreed to voluntarily withdraw the portions of its claims that are predicated upon a lack of profitability."). Indeed, NYCBS's CEO testified that, although only a third of NYCBS's dispensary patients are Caremark members, Ex. 1,189:3–12, Caremark comprises a staggering 60% of NYCBS's dispensing revenue, Ex. 1, 264:24–265:14; Ex. 2, J-362 at 21:17–24.

## VI.    The Arbitration

NYCBS filed an arbitration against Caremark challenging the program's reimbursement structure. Following an evidentiary hearing, the Panel rejected NYCBS's claims that Petitioners (1) violated New York Public Health Law § 4406-c, (2) breached the parties' contract by assessing PNR on inapplicable claims, (3) violated the federal Prompt Pay Act, and (4) were liable for

conversion. Ex. 23, Award. However, the Panel found in NYCBS's favor on its remaining claims and concluded that Petitioners were liable for breach of contract and unjust enrichment. *Id.*

NYCBS's allegation that Caremark's PNP violated the AWPL was central to NYCBS's breach-of-contract and unjust-enrichment claims. 42 U.S.C. § 1395w-104(b)(1)(A); *see also* 42 C.F.R. § 423.120(a)(8)(i); 42 C.F.R. § 423.505(b)(18). NYCBS alleged that the program's reimbursement terms violated a Medicare regulation that requires CMS and Plan Sponsors "[t]o agree to have a standard contract with reasonable and relevant terms and conditions of participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy . . . ." 42 C.F.R. § 423.505(b)(18). Based on this regulation, which governs CMS's dealings with Plan Sponsors, NYCBS asserted that the PNP's terms and conditions were not "reasonable and relevant" to its business model.

In response, Petitioners submitted to the Panel the arguments now at issue before this Court. *See* Ex. 24, Brief on Omnibus Motion (5/12/2022); Ex. 25, Posthearing Brief (5/15/2023); Ex. 26, Response to Posthearing Brief (6/5/23). The Panel ignored these arguments. Specifically:

- The Panel ignored New York and Arizona law establishing that a breach-of-contract claim based on the violation of a statute without a private right of action is improper, finding that NYCBS could proceed with its breach-of-contract claim based on Caremark's alleged violation of the AWPL. Ex. 27, Panel Order No. 7 (6/24/2022), at 6. In doing so, the Panel relied upon an inapposite Eighth Circuit decision in which a statute without a private right of action was ***expressly incorporated*** into the contract at issue. *See Trone Health Servs., Inc. v. Express Scripts Holding Co.,* 974 F.3d 845 (8th Cir. 2020) (contract expressly identified and incorporated HIPAA).

- The Panel ignored CMS's explicit guidance regarding the agency's lack of authority to involve itself in reimbursement disputes, incorrectly finding that the AWPL, a statute CMS enforces, could be used to regulate reimbursement matters. Ex. 27, Panel Order No. 7 (6/24/2022), at 6.

- The Panel erroneously concluded that "[NYCBS] should be defined as a pharmacy within the meaning of the AWPL." Ex. 27, Panel Order No. 7 (6/24/2022), at 6; *see also* Ex. 23, Award, at 10. This conclusion ignored authority establishing that (1) the Medicare Act does not apply to dispensing

physicians, and (2) New York public policy rejects characterizing dispensing physicians as pharmacies. Ex. 25, Posthearing Brief (5/15/2023), at 16 n.7 (noting the "potential conflict of interest . . . when a physician acts as both a prescriber and a seller of prescription drugs").

- The Panel erroneously found that NYCBS had "properly asserted claims on behalf of affiliated pharmacies" and that the arbitration was "not a consolidated proceeding but a claim brought on an individual basis by [NYCBS] against [Petitioners]." Ex. 27, Panel Order No. 7 (6/24/2022), at 6. The fact that NYCBS executed each Provider Agreement is irrelevant. Each NYCBS-affiliated dispensary contracted with Caremark under a unique bilateral contract. Nothing permitted the Panel to consolidate the claims of six different dispensaries that contracted with Caremark under separate and independent contracts, each of which included a provision prohibiting consolidated proceedings.

Additionally, although the Panel was aware that the PNP only affected reimbursement related to the 2% variable network range, the Panel awarded NYCBS $17,082,162 in damages. This damages award ignored the contractual floor of PNR that NYCBS knew, accepted by contract, and would have paid in any scenario, resulting in a windfall far above what NYCBS expected under the terms of the agreement. *See supra* Background, Part III. In reaching this outcome, the Panel concluded, in violation of Arizona and New York law, that Petitioners were liable for both breach of contract and unjust enrichment. Ex. 25, Posthearing Brief (5/15/2023), at 30 (noting that a finding of unjust enrichment is improper when a contract governs the dispute).

## LEGAL STANDARDS

Although an arbitrator's decision is entitled to deference, *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir. 1988), that deference "is not the equivalent of a grant of limitless power," *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990). "This is not to say that simply by making the right noises—noises of contract interpretation—an arbitrator can shield from judicial correction an outlandish disposition . . . ." *Marine Pollution,* 857 F.2d at 94 (internal quotation marks omitted). "When it is clear that the arbitrator *must* have based [the] award on some body of thought, or feeling, or policy, or law that

is outside the contract," then "the arbitrator has failed to draw the award from the essence of the [contract]." *Id.* (emphasis in original) (internal quotation marks omitted); *see also Am. Fed'n of Television & Radio Artists, AFL–CIO v. Benton & Bowles,* 627 F. Supp. 682, 686 (S.D.N.Y. 1986) (vacating award where arbitrators awarded relief at odds with the contract).

Section 10 of the FAA provides several grounds for vacating an award, including "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). A court also has the authority to vacate an award that violates public policy, *see Pro's Choice Beauty Care, Inc. v. Local 2013, United Food & Commercial Workers,* 2017 WL 933089, at *2 (E.D.N.Y. Mar. 7, 2017), or manifestly disregards the law, which occurs when the "the arbitrator . . . appreciate[s] the existence of a clearly governing legal principle but decide[s] to ignore or pay no attention to it," *see Westerbeke Corp. v. Daihatsu Motro Co., Ltd.,* 304 F.3d 200, 209 (2d Cir. 2002) (internal quotation marks omitted).

## ARGUMENT

There are three grounds for vacating the Award.

*First*, the Panel exceeded its authority by awarding NYCBS damages that violated the plain terms of the parties' contract and exceeded NYCBS's reasonable expectations. As NYCBS itself has admitted, the PNP only affects a 2% variable range of PNR. Within that variable range, there was a minimum percentage of PNR that NYCBS *always* expected to pay. The Panel exceeded its authority when it deleted this contractual floor from the parties' agreement.

*Second*, the Award violates public policy. The Panel found that NYCBS was a "licensed pharmacy" covered by the AWPL, even though (1) CMS acknowledges that the AWPL only applies to licensed pharmacies, not dispensing practitioners like NYCBS, and (2), based on public-policy concerns, the New York State Education Department ("SED") has unequivocally stated that dispensing practitioners are not pharmacies under New York law.

12

*Third,* the Panel manifestly disregarded the law by (1) ruling that NYCBS's AWPL claim had merit, (2) concluding that NYCBS was entitled to relief for both its breach-of-contract and unjust-enrichment claims, (3) awarding damages in violation of the parties' contract and their reasonable expectations, and (4) improperly consolidating the claims of multiple NYCBS-affiliated dispensaries in violation of the arbitration provision's anticonsolidation language.

I.     **The Court should vacate the Award because the Panel exceeded its authority by awarding windfall damages to NYCBS.**

The Panel exceeded its authority, and dispensed its "own brand of industrial justice," when, in awarding damages of $17,082,162 to NYCBS, the Panel "ignore[d] the plain language of the [parties'] contract" and rewrote the contract to delete the provision requiring NYCBS to pay PNR to Caremark. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 38 (1987).

NYCBS's complaints regarding the PNP only implicated the highest 2% of the variable network range in each network. Ex. 1, 257:8–13. When NYCBS signed up for the PNP, it knew it would pay *some* PNR, even if the PNR it paid were the minimum because NYCBS achieved the highest possible scores available. Ex. 2, 257:23–258:15, 306:7–307:2, 311:13–20, 635:11–17; Ex. 11, J-366 at 69:10–20. Based on NYCBS's expectations, its damages, if any, should have been capped at the difference between the PNR it actually paid and the PNR it would have paid based on the lowest possible rate within the 2% variable range of each network it participated in, an amount totaling $2,627,640.08, ***not*** $17,082,162. Ex. 20, Hutchins Decl. at ¶¶9–12; Ex. 21, Exhibit 1-A to Hutchins Decl.; *see also* Ex. 1, 1160:17–1161:21.

The Panel effectively deleted the variable-rate language from the contract when it awarded NYCBS all NYCBS's PNR, including rebates associated with the portion of the variable range not affected by NYCBS's performance in the PNP. *See id.* This windfall, which ignores the parties' contract, requires vacating the Award. *PMA Cap. Ins. Co. v. Platinum Underwriters Bermuda,*

13

*Ltd.*, 400 Fed. App'x 654, 656 (3d Cir. 2010) (vacating arbitration award where arbitrators "exceeded their power when they awarded $6 million and eliminated the 'deficit carry forward' portion of the contract"); *Collins & Aikman Floor Coverings Corp. v. Froehlich*, 736 F. Supp. 480, 484 (S.D.N.Y. 1990) (vacating arbitration award where arbitrator awarded damages for a "reasonable period of time" even though the contract did not include such a term).

AAA Rule 47, on which the Panel relied, does not alter this analysis. The Panel ruled that it could only "grant 'just and equitable' relief in accordance with AAA Rule 47" by "requiring a full return of the wrongfully assessed PNR fees." Ex. 23, Award, at 31. In doing so, the Panel failed to acknowledge a critical qualification in Rule 47, which states that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable ***and within the scope of the agreement of the parties*** . . . ." Ex. 28, AAA Rules (Oct. 1, 2013) at R-47 (emphasis added). The Panel's disregard for the italicized language demonstrates that it did not rely on the contract's terms, but rather on what it subjectively perceived to be "just and equitable." This was improper.

The Panel's role was to "'give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010). The Panel failed to do so. Instead, the Panel adopted findings that did not draw their "essence from the agreement," but rather were based on the Panel's "notions of equity." *Marine Pollution*, 857 F.2d at 95 (vacating award because an arbitrator cannot "import[] . . . notions of equity into the arbitration" that are not "drawn . . . from the contract"); *see also Leed*, 916 F.2d at 65 (vacating award and stating that arbitrators "may not impose a remedy which directly contradicts the express language" of the contract).

Because the Panel awarded a remedy not contemplated by the parties' contract, the Panel exceeded its authority, and the Court should vacate the Panel's Award. *See, e.g., 187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005) (arbitrator exceeded authority by fashioning

remedy not contemplated by parties' contract); *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (arbitrators exceeded authority by awarding punitive damages in violation of applicable law adopted by parties' contract); *Magid v. Waldman*, 2020 WL 4891218, at *6 (S.D.N.Y. Aug. 19, 2020) (vacating award because arbitrator exceeded his authority by awarding attorney's fees in the absence of a contractual provision allowing fee-shifting); *Clarendon Nat'l Ins. Co. v. TIG Reinsurance Co.*, 990 F. Supp. 304, 311 (S.D.N.Y. 1998) (finding that arbitrators exceeded their authority by awarding interest when the contract at issue did not provide for it); *Collins*, 736 F. Supp. at 484 (arbitrator exceeded her authority when she awarded damages in violation of the parties' contract); *Matter of Arbitration Between Melun Indus., Inc. & Strange*, 898 F. Supp. 990, 993 (S.D.N.Y. 1990) (vacating arbitration award where "arbitrator exceeded his authority and drastically altered the contracting rights of the parties").

II.    **The Court should vacate the Award because the Panel violated public policy by concluding that NYCBS is a pharmacy covered by the AWPL.**

"[A] court may vacate an arbitral award . . . that . . . contravenes public policy." *Pro's Choice*, 2017 WL 933089, at *2. "This principle, which is derived from the common law doctrine of refusing to enforce a contract that violates law, authorizes courts to vacate an arbitral award if it conflicts with laws and legal precedents." *Id.* (internal quotation marks omitted). This basis for vacatur is "only applicable where the public policy is well-defined and dominant as ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (internal quotation marks omitted).

Here, the Panel ruled, without any support, that the AWPL applies to a dispensing practitioner like NYCBS, thereby allowing NYCBS to pursue its AWPL claim against Petitioners. The Court should vacate this finding because it is based on the Panel's "own conception of public policy," which directly contradicts the public policy articulated by CMS and SED. *See, e.g., Stolt-*

*Nielsen,* 559 U.S. at 663 (panel exceeded its powers when it "proceeded as if it had the authority

of a common-law court to develop what it viewed as the best rule to be applied in such a situation").

**A.    The Panel's ruling that NYCBS is a pharmacy disregards CMS's regulatory authority.**

NYCBS's AWPL claim was based on Caremark's alleged violation of 42 C.F.R. §

423.505(b)(18), which states that contracts between CMS and Plan Sponsors must "have a standard

contract with reasonable and relevant terms and conditions of participation whereby any willing

*pharmacy* may access the standard contract and participate as a *network pharmacy . . . .*" 42 C.F.R.

§ 423.505(b)(18) (emphasis added). The issue is whether NYCBS is a "pharmacy" under the

Medicare framework. It is not.

CMS has substantial discretion to interpret the Medicare Act and associated regulations.

*See Abraham Lincoln Mem'l Hosp. v. Sebelius,* 698 F.3d 536, 547–48 (7th Cir. 2012). CMS's

interpretation of these laws should have guided the Panel's decision regarding whether the AWPL

applied to NYCBS. Instead of deferring to CMS's technical expertise, the Panel ignored it.

CMS has explicitly recognized that the Part D laws do not apply to dispensing practitioners.

In a letter dated January 6, 2017, CMS's chief administrator, Andy Slavitt, advised the Community

Oncology Alliance, an organization for which NYCBS's own CEO served as president, Ex. 1,

104:14–18, that:

> ***While Part D sponsors are only required to contract with pharmacies***, we are
> aware that some Part D sponsors have contracts with physician practices, including
> oncology practices, that are authorized by States to dispense prescription drugs.
> ***Current guidance is silent on the issue of inclusion of non-pharmacy dispensing
> sites in Part D networks.*** In light of changes to the pharmaceutical dispensing and
> distribution landscape since the inception of the Part D program, CMS is currently
> evaluating the role of non-pharmacy dispensing sites in the Medicare Part D
> program and is committed to working with stakeholders as we consider any
> possible changes to the existing regulations or guidance going forward.

Ex. 29, C-1050, Exhibit B (emphasis added).

16

Similarly, in 2018, CMS declined to issue any rules in response to comments requesting that it "*expand [its] definition of 'network pharmacy' and interpretation of 'any willing pharmacy' to include dispensing physicians . . . .*" 83 Fed. Reg. at 16593 (emphasis added).

Despite these clear statements by CMS, the Panel concluded that the AWPL applies to Caremark's relationship with NYCBS. This conclusion improperly disregarded CMS's regulatory authority. *See Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 59 (2011) (noting that courts must "defer to an agency's interpretation of its regulations, even in a legal brief . . . ."); *see also Williams Alaska Petro., Inc. v. United States*, 57 Fed. Cl. 789, 796 (2003) (stating that a court has "no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision").

**B.      The Panel's ruling that NYCBS is a pharmacy disregards SED's regulatory authority.**

The Award also violates SED's regulatory authority. The Medicare Act's definition of "network pharmacy" only encompasses "licensed pharmacies." 42 C.F.R. § 42.100. To that end, the Medicare statute defers to the individual states on licensing issues. 42 U.S.C. § 1395w-112(g) (incorporating 42 U.S.C. § 1395w-26(b)(3), which states that the Medicare Act "shall supersede any State law or regulation (*other than State licensing laws* . . . .)") (emphasis added). As noted above, NYCBS admits that it is *not* a licensed pharmacy. Ex. 16, J-373 at 31:2–9.

Indeed, NYCBS is currently litigating with SED regarding whether NYCBS, as a dispensing practitioner, is entitled to be reimbursed at the more lucrative pharmacy-benefit reimbursement level, rather than the less lucrative medical-benefit reimbursement level, for filling prescription drugs for Medicaid beneficiaries. Ex. 30, Complaint. In that case, SED asserts that "[a] practitioner who dispenses drugs to their patients *is not considered a pharmacy* under statutory and enrollment requirements . . . ." Ex. 31, SED Opposition Brief, at 5 (Dkt. 8) (emphasis added). According to SED, New York is reluctant to grant dispensing practitioners pharmacy licenses

because a "potential conflict of interest . . . occurs when a physician acts as both a prescriber and a seller of prescription drugs . . . ." Ex. 31, SED Opposition Brief, at 4 (Dkt. 8). Critically, "this conflict might lead physicians to prescribe unnecessary drugs, to prescribe brand name drugs that the physician sells rather than generics or to charge excessive prices." Ex. 32, Sullivan Affidavit; *see also* Ex. 33, Policy Jacket for Senate Bill 6866-A, at 7 (discussing legislative purpose of eliminating conflicts of interest when prescriber acts as pharmacist) & 15 (stating that the Consumer Protection Board supported the legislation to protect consumers from drug sales affected by conflicts of interest when prescribers act as pharmacists).

## C.   The Court should vacate the Award because the Award violates public policy.

By concluding that NYCBS was a pharmacy, Ex. 27, Panel Order No. 7 (6/24/2022), at 6, the Panel created a requirement under the Medicare Act that does not exist (i.e., that dispensing practitioners are protected by the Medicare Law) and ignored New York's rationale for declining to treat dispensing practitioners like pharmacies (i.e., that a conflict of interest exists when a physician serves as a pharmacy). This was improper.

The Panel's Award represents "the rare instance[] in which 'the arbitrator knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 95 (2d Cir. 2008), *rev'd on other grounds*, 559 U.S. 662 (2010). Because the Award violates public policy, the Court should vacate it. *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980) (stating that "an award may be set aside if it compels the violation of law or is contrary to a well accepted and deep rooted public policy"); *Perma–Line Corp. of Am. v. Sign Pictorial & Display Union, Local 230, Int'l Bhd. of Painters & Allied Trades, AFL–CIO*, 639 F.2d 890, 895 (2d Cir. 1981) (stating that, if "the award . . . is contrary to law or public policy it is open to, and indeed incumbent upon, th[e] court to step in").

18

**III.   The Court should vacate the Award because the Panel manifestly disregarded the law.**

A court may vacate an arbitration award that manifestly disregards the law. *See Hardy v. Walsh Manning Secs., L.L.C.*, 341 F.3d 126, 133 (2d Cir. 2003). Vacating an award based on this standard "requires more than a mistake of law or a clear error in fact finding." *Id.* (internal quotation marks omitted). Instead, an arbitrator manifestly disregards the law where the arbitrator appreciates the law but nonetheless ignores it. *Westerbeke,* 304 F.3d at 209.

Manifest disregard is not limited to the "rare case" in which an arbitrator "explicitly acknowledge[s]" ignoring the law. *Id.* at 218. Rather, an arbitrator's manifest disregard for the law may be inferred if the arbitrator was briefed on the law but ignored it. *See id.* at 217.

Courts in the Second Circuit have found manifest disregard for the law in a variety of situations. *See, e.g., Porzig v. Dresdner, Kleinwort, Benson, N. Am., L.L.C.*, 497 F.3d 133, 142 (2d Cir. 2007) (finding manifest disregard for the law where attorney's fees were awarded); *N.Y. Tel. Co. v. Commc'ns Workers of Am. Local 1100, AFL–CIO Dist. One*, 256 F.3d 89, 92 (2d Cir. 2001) (finding manifest disregard for the law where the arbitrator rejected binding precedent); *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998) (finding manifest disregard for the law where "the arbitrators were correctly advised of the applicable legal principles"); *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) (vacating portion of award mandating punitive damages where New York law prohibited arbitrators from awarding those damages). Like the foregoing cases, the Court should find that the Panel manifestly disregarded the law, too.

**A.   The Panel manifestly disregarded the law by ruling that NYCBS's AWPL claim had merit.**

**1.   The Panel disregarded Arizona and New York law by finding that NYCBS could proceed with a breach-of-contract claim based on the alleged violation of a statute with no private right of action.**

The AWPL does ***not*** provide a private right of action. *See, e.g., United/Xcel–Rx, L.L.C. v. Express Scripts, Inc.*, 2019 WL 5536806, at *5 (E.D. Mo. Oct. 25, 2019) (noting that "[n]one of [the AWPL's] provisions provide an express or implied cause of action"); *Heartland Med., L.L.C. v. Express Scripts, Inc.*, 2018 WL 6831164, at *2 (E.D. Mo. Dec. 27, 2018) (same). To circumvent the absence of a private right of action, NYCBS asserted its AWPL claim in the context of a breach-of-contract claim based on the Provider Agreement's "Compliance With Laws" provision. Ex. 14, J-58, at ¶ 16.01, p. 93. The Panel had no basis for allowing NYCBS to do so.

The Panel relied on *Trone Health Services, Inc. v. Express Scripts Holding Co.*, 974 F.3d 845 (8th Cir. 2020), to find that NYCBS could pursue a breach-of-contract claim based on the AWPL. *Trone* is distinguishable. In *Trone*, the statute at issue—HIPAA—was directly referenced in the parties' contract. *Id.* at 851. Here, by contrast, the AWPL is not directly identified in the Provider Manual's "Compliance With Laws" provision. *See* Ex. 14, J-58, at ¶ 16.01, p. 93. The provision's general reference to federal law is insufficient. *See Earman v. United States,* 114 Fed. Cl. 81, 103 (2013) (rejecting argument that provision stating that a contract "shall be carried out in accordance with applicable Federal statutes and regulations" expressly incorporated laws governing the Conservation Security Program ("CSP"), including 7 C.F.R. § 1469.21(e), which required CSP contracts to "[i]ncorporate all provisions as required by law or statute . . . ."); *Molina Healthcare of Cal., Inc. v. United States,* 133 Fed. Cl. 14, 46 (2017) (finding, in a dispute between a health insurer and the Department of Health and Human Services ("HHS") involving the Affordable Care Act ("ACA"), that a contract stating it would "be governed by the laws and common laws of the United States" did not incorporate section 1342 of the ACA), *rev'd on other grounds*, *Maine Cmty. Health Options v. United States,* 140 S. Ct. 1308 (2020).

Moreover, New York and Arizona law, which govern Caremark's contracts with NYCBS, expressly prohibit common-law claims based on the violation of statutes containing no private

rights of action. *Gunther v. Capital One, N.A.*, 703 F. Supp. 2d 264, 269 (E.D.N.Y. 2010) (concluding that "to permit a breach of contract suit based on [the Truth in Savings Act's ("TISA")] substance would frustrate Congress's express indication that TISA be enforced exclusively by public entities"); *Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 558–59 (S.D.N.Y. 2004) (rejecting breach-of-contract claim because allowing plaintiff to sue defendant for breach of contract based on violation of federal statutes without private right of action would "interfere with the legislative intent" to have public entities enforce the statutes); *Ansley v. Banner Health Network,* 248 Ariz. 143, 151 (2020) ("[A]n action to enforce a contract that incorporates federal statutory obligations cannot substitute for a private right of action where it 'is in essence to enforce the statute itself.'") (internal citations omitted); *Wright v. Chase Home Fin., L.L.C.*, 2011 WL 2173906, at *2 (D. Ariz. June 2, 2011) (concluding that the plaintiff did "not have standing to assert violations of [the federal Home Affordable Mortgage Program], even as a breach of contract claim incorporating its terms"); *see also Bullock v. United States*, 883 F.2d 1023, *1 (9th Cir. 1989) (rejecting breach-of-contract claim predicated on violation of the Davis–Bacon Act).

To the extent the Panel ignored New York and Arizona law, the Award should be vacated. *See, e.g., N.Y. Tel.,* 256 F.3d at 92 (finding manifest disregard of the law where the arbitrator rejected binding Second Circuit precedent in favor of nonbinding precedent from other circuits).

###### 2.      The Panel willfully ignored the Medicare Act's noninterference clause.

The Medicare Act's noninterference clause[1] precludes HHS and CMS from involving themselves in negotiations between pharmacies and payers over reimbursement matters. 42 U.S.C. § 1395w-111(i). Based on the noninterference clause, neither entity has "authority to . . . mandate that Part D plans negotiate" a particular price or contract structure, 70 Fed. Reg. at 4255, or become

---

[1] In 2022, Congress passed the Inflation Reduction Act, which modified the noninterference clause. *See* Pub. L. No. 117-169, §§11001–04, 136 Stat. 1818, 1833–64 (2022) (codified in part at 42 U.S.C. §§ 1320f–1320f-7). These changes do not affect Petitioners' arguments for the timeframe at issue in the arbitration.

"the arbiter of the adequacy of reimbursement methodologies," 79 Fed. Reg. 29844, 29876 (May 23, 2014).

HHS and CMS have consistently recognized that they have no authority to tell Plan Sponsors or their PBMs how to develop their performance programs. As HHS has acknowledged, "price concessions are negotiated between pharmacies and sponsors or their PBMs and are neither authorized nor restricted by HHS's rulemaking," and "it strains credulity" to assume that HHS could prohibit price concessions, since the noninterference clause precludes this. Ex. 34, HHS Reply Brief ISO Motion to Dismiss in *Nat'l Cmty. Pharmacists Ass'n v. Becerra, et al.*, Case No. 21–cv–131–ABJ, at 4, 12 (emphasis added). Further, in recent rulemaking, CMS acknowledged the noninterference clause in stating that "[c]ontracts between sponsors or their PBMs and pharmacies can continue to provide for performance-based adjustments." 87 Fed. Reg. 1842, at 1915 (Jan. 12, 2022).

The noninterference clause is especially relevant here because HHS and CMS are ultimately responsible for enforcing the AWPL. *See* 42 C.F.R. § 423.505(n) (discussing CMS's ability to ensure compliance with Medicare regulations, including 42 C.F.R. § 423.505(b)(18)); 83 Fed. Reg. at 16592 (stating, in addressing comment regarding reasonable and relevant terms, that CMS "reserves the right to review all contracting terms and conditions and investigate complaints regarding compliance with [its] rules"); 79 Fed. Reg. at 29874 (stating, after referencing the AWPL, that "*Part D sponsors and pharmacies do not have sole discretion to interpret these specific matters*") (emphasis added). It is a gross misreading of the Medicare Act to say that, on the one hand, CMS has no role in regulating reimbursement, but on the other, the AWPL permits CMS to serve as a check and balance on the specific reimbursement-related performance terms agreed to by providers. This reading would render the noninterference clause null and void.

When Petitioners presented the Panel with CMS authority rejecting the Panel's broad interpretation of the noninterference clause, the Panel summarily rejected Petitioners' argument without explanation. Ex. 23, Panel Order No. 7 (6/24/2022), at 6 ("The Panel disagrees with [Petitioners'] interpretation of the Non-Interference Clause and finds there is an obligation under the AWPL to provide 'reasonable and relevant' terms and conditions to providers."). In doing so, the Panel manifestly disregarded the law.

### 3. The Panel disregarded the law when it concluded that NYCBS is a "pharmacy" subject to protection under the AWPL.

As discussed above, the Panel manifestly disregarded the law when it ignored (1) authority from CMS indicating that the AWPL does not apply to dispensing practitioners, (2) authority from SED establishing that NYCBS should be considered a pharmacy under New York law, and (3) NYCBS's own admission that it is not a licensed pharmacy. *See supra* Argument, Part II.

### B. The Panel manifestly disregarded the law by ruling that NYCBS prevailed on both its breach-of-contract and unjust-enrichment claims.

The Panel found that Caremark was liable to NYCBS for both breach of contract and unjust enrichment. This aspect of the Panel's ruling is illogical because NYCBS *never* disputed the existence of a contract, and black-letter law dictates that unjust enrichment does not apply where a contract governs the parties' relationship. *Valley Juice, Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) ("Under New York law, '[t]he existence of a valid and enforceable contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 574 (E.D.N.Y. 2015) (dismissing unjust-enrichment claim where the dispute was governed by a contract); *see also Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174 (Ariz. 1976) ("[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust

enrichment has no application."); *SiteLock L.L.C. v. GoDaddy.com, L.L.C.*, 562 F. Supp. 3d 283, 310 (D. Ariz. 2022) (rejecting unjust-enrichment claim where parties had contractual relationship).

Here, Petitioners consistently argued that it was not legally possible for NYCBS to prevail on both its breach-of-contract and unjust-enrichment claims. *See supra* Background, Part VI. More importantly, NYCBS did not dispute this fact because it explicitly described its unjust-enrichment claim as an "alternative" theory of liability against Petitioners. Ex. 35, Opposition to Motion for Summary Judgment, at 16–17.

Without addressing the law, or the parties' agreement that breach-of-contract liability is incompatible with unjust-enrichment liability, the Panel reached the puzzling conclusion that Petitioners were liable on both theories. In doing so, the Panel manifestly disregarded the law. *See, e.g., Halligan*, 148 F.3d at 203–04 (finding manifest disregard for the law where arbitrators issued award even though "both parties generally agreed on the applicable law").

### C.     The Panel manifestly disregarded the law by awarding windfall damages.

Finally, as discussed above in the context of the Panel exceeding its authority, the Panel manifestly disregarded the law by awarding damages in violation of what is legally permissible under New York and Arizona law. *See supra* Argument, Part I.

### D.     The Panel manifestly disregarded the law by consolidating the claims of multiple dispensaries in violation of the arbitration provision's anticonsolidation language.

The separate arbitration agreements between Caremark and the NYCBS dispensaries prohibit the dispensaries from commencing a single arbitration. It is irrelevant that NYCBS signed each of the Provider Agreements: each dispensary entered into its own contract with Caremark, each was scored separately under the PNP, and each was assessed PNR on an individual basis based on its individual performance. Each dispensary's contract incorporates by reference the

Provider Manual, which specifically requires arbitrations to be conducted on an *individual* basis, not a *consolidated* one. Exhibit 14, J-58, ¶15.09 at 52–53.

Courts have uniformly held that, for consolidated arbitration proceedings to occur, an affirmative contractual basis for consolidation must exist. *See Lamps Plus, Inc. v. Varela,* 139 S. Ct. 1407, 1416 (2019) (absent express contractual authority, claimant could not proceed with arbitration on a class basis). Attempts to consolidate arbitration proceedings under multiple agreements are not allowed absent consent by every party to those agreements. *See Weyerhaeuser Co. v. W. Seas Shipping Co.,* 743 F.2d 635, 637 (9th Cir. 1984) (refusing to consolidate two arbitration proceedings because there were two separate agreements, each of which contained its own arbitration provision requiring arbitration only between the parties to the agreement); *see also Marbaker v. Statoil USA Onshore Props., Inc.,* 801 Fed. App'x 56, 60–62 (3d Cir. 2020) (arbitration provisions in five separate agreements did not allow class arbitration where the agreements "use[d] bilateral language to describe the disputing parties"); *Herrington v. Waterstone Mortg. Corp.,* 2019 WL 1866314, at *5–6 (W.D. Wis. April 25, 2019) (vacating arbitration award where arbitrator permitted class arbitration even though agreement expressly foreclosed it).

The Panel manifestly disregarded the law by ignoring this well-settled principle and permitting NYCBS to consolidate the claims of all its dispensaries into a single arbitration.

## CONCLUSION

For these reasons, Petitioners respectfully request the entry of an order vacating the Award.

Dated: September 27, 2023

Respectfully submitted,

Kevin P. Shea
Seth A. Horvath
Elizabeth Z. Meraz
Aon S. Hussain
**Nixon Peabody LLP**

70 W. Madison Street, Suite 5200
Chicago, Illinois 60602
Telephone: (312) 977-4400
Facsimile: (844) 560-8137
kpshea@nixonpeabody.com
sahorvath@nixonpeabody.com
ezmeraz@nixonpeabody.com
ahussain@nixonpeabody.com
(pro hac vice applications forthcoming)

Neil P. Diskin
**Nixon Peabody LLP**
275 Broadhollow Road
Suite 300
Melville, NY 11747-4808
Telephone: (516) 832-7520
Facsimile: (833) 893-0881
ndiskin@nixonpeabody.com

*Attorneys for Petitioners Caremark, L.L.C.,*
*CaremarkPCS, L.L.C., Caremark IPA,*
*L.L.C., SilverScript Insurance Company,*
*and Aetna, Inc.*