Jonathan E. Levitt, Esq.
Todd Mizeski, Esq.
Steven L. Bennet, Esq. Frier Levitt, LLC
84 Bloomfield Avenue
Pine Brook, NJ 07058
(973) 618-1660
(973) 618-0650
jlevitt@frierlevitt.com
tmizeski@frierlevitt.com
sbennet@frierlevitt.com
*Counsel for Respondent New York Cancer & Blood Specialists*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Caremark LLC; CaremarkPCS, LLC; SilverScript Insurance Company; and Aetna, Inc., | Case No. 23–cv–08508 |
| Petitioners, | |
| v. | **RESPONDENT'S OPPOSITION TO PETITIONERS' MOTION TO VACATE ARBITRATION AWARD** |
| New York Cancer & Blood Specialists, | |
| Respondent. | **(ORAL ARGUMENT REQUESTED)** |

## Table of Contents

RESPONDENT'S MEMORANDUM OPPOSING PETITIONERS' MOTION TO VACATE
ARBITRATION AWARD ................................................................................................. 1

BACKGROUND ................................................................................................................. 1

PRELIMINARY STATEMENT ........................................................................................ 6

LEGAL STANDARD ......................................................................................................... 7

LEGAL ARGUMENT ........................................................................................................ 9

    I.    This Court Should Deny Caremark's Motion to Vacate Because the Panel Was Well Within
        Their Authority to Invalidate the Terms of Caremark's PNR Program and Order Caremark
        to Return All DIR Fees. .............................................................................................. 9

    II.   The Arbitration Award Does Not Compel the Violation of Public Policy Because There is no
        Applicable Well-Defined and Dominant Public Policy to Violate. ........................... 13

        A.    The Panel's Ruling That NYCBS is Protected Under the AWPL Does Not Violate a
                Well-Defined and Dominant Policy Articulated by CMS. ............................. 13

        B.    The Panel's Ruling That NYCBS is Protected Under the AWPL Does Not Violate a
                Well-Defined and Dominant Policy Articulated by New York ..................... 16

    III.  The Panel did not Manifestly Disregard the Law Because They Did Not "Appreciate but
        Ignore" the Law. ........................................................................................................ 16

        A.    The Panel's Determination that NYCBS Could Proceed With its Breach of Contract
                is a Permissible Interpretation of Law and Consistent with Other DIR Fee Awards
                Against Caremark, Confirmed by Federal Courts. ....................................... 17

        B.    The Panel's Refusal to Adopt Petitioners' Interpretation of the Noninterference
                Clause Does Not Qualify as a Manifest Disregard of Law because the Panel did not
                Appreciate the Law but Ignore it. ................................................................ 19

        C.    The Panel's Determination That NYCBS Is a "Pharmacy" For Purposes of the
                AWPL Was Fact-Specific and Therefore Not Subject to Review. ................ 21

        D.    The Panel Did Not Manifestly Disregard the Law by Awarding NYCBS Restitution
                Damages While Also Finding That Caremark Breached the Contract. .......... 21

CONCLUSION ................................................................................................................... 25

**RESPONDENT'S MEMORANDUM OPPOSING PETITIONERS' MOTION TO
VACATE ARBITRATION AWARD**

New York Cancer & Blood Specialists ("Respondent" or "NYCBS") hereby submits this response to the Motion to Vacate Arbitration Award ("Motion") filed by Petitioners (collectively, "Petitioners" or "Caremark"). For the reasons set forth herein, Petitioners' Motion should be denied.

**BACKGROUND**

NYCBS is an independent oncology practice that dispenses complex and life-saving cancer medications to cancer patients, including Medicare beneficiaries. Declaration of Jonathan Levitt ("Levitt Decl."), Exh. A at 2. NYCBS devotes its resources to caring for cancer patients. To serve Medicare beneficiaries, NYCBS must enroll in Medicare Part D Prescription Drug Plan (PDP) networks.  Only network providers contracted with a pharmacy benefit manager (PBM) may dispense drugs to beneficiaries and receive reimbursement from PBMs. NYCBS participates in SilverScript and Aetna's Medicare networks, among others, pursuant to Caremark's (the PBM's) Provider Agreement (Agreement). Each NYCBS dispensing location is incorporated under the same Tax Identification Number and has the same contract with Caremark. See e.g., Pet.'s Ex. 12.

Beginning in 2016, Caremark invented and implemented a Performance Network Rebate ("PNR") Program on behalf of its sister companies, SilverScript and Aetna.  Beginning in Medicare Plan year 2016, under the PNR Program, Caremark began to assess direct and indirect remuneration fees ("DIR Fees"). Id. at 3, 8-10. Caremark unilaterally recoups DIR Fees from providers like NYCBS.[1] Caremark assesses DIR fees from NYCBS retroactively, many months

---

[1] See National Association of Chain Drug Stores, *Direct and Indirect Remuneration (DIR) Fees Explained*, https://www.nacds.org/dir-fees/#:~:text=DIR%20fees%20are%20the%20result,on%20so%2Dcalled%20quality%20measures. (last visited Oct. 10, 2023).

1

after NYCBS has dispensed an oncology drug to a Medicare beneficiary and months after Caremark has reimbursed NYCBS. Caremark unilaterally recoups these retrospective DIR fees out of reimbursements owed to NYCBS for unrelated claims. The amount Caremark withholds is *supposed to be* based on the provider's individual "performance" across several categories intended largely to measure patient "adherence" to medications. See, e.g., Pet.'s Ex. 15 (Trimester Reports). "Adherence" is supposed to measure how well the Medicare beneficiary stayed on her oncology medication regimen. Between 2016 and the Final Hearing, Caremark improperly and unlawfully assessed approximately **$17,082,162** in DIR Fees. See Levitt Decl., Exh. A, at 30.

On October 10, 2019, NYCBS commenced arbitration proceedings against Petitioners to recover DIR fees, captioned New York Cancer & Blood Specialists v. Caremark, LLC et al., Case No. 01-21-0016-4612 ("Arbitration"). Id. at 4. The American Arbitration Association ("AAA") administered the matter pursuant to the Commercial Arbitration Rules and Mediation Procedures ("AAA Rules") and the parties' agreement. Id. at 1. NYCBS alleged nine (9) individual causes of action against Caremark related to Caremark's PNR Program. NYCBS alleged that Petitioners violated the Medicare Part D Any Willing Provider Law, 42 U.S.C. Sec. 1395w-104(b)(1)(A) ("AWPL") and, in turn, breached the parties' agreement by using two inaccurate and statistically flawed calculation methods; namely, Caremark used a flawed Medication Possession Ratio ("MPR")[2] formula and improperly used Mean Imputation. NYCBS requested a full return of the DIR Fees as damages, plus attorneys' fees, costs, and interest. In an Order on the parties' "Omnibus

---

[2] Caremark defines MPR as "the sum of the days' supply for all fills in a given class in a particular time period, divided by the number of days in the time period." Pet.'s Ex. 25, at 13. The "number of days" this ratio measures adherence from the first date the patient fills their prescription medication to the end of an arbitrary measurement period predetermined by Caremark. See Levitt, Decl., Exhibit B at 1128. Caremark witnesses testified at the Final Hearing that MPR is "standard in the industry." Pet.'s Ex. 25, at 13-14. However, the Panel acknowledged Caremark's admission that the way Caremark determines the precise "number of days" is "not in the contract." See Levitt Decl., Exhibit A, Interim Award, at 14. Ultimately, the panel concluded based on the facts presented "by a preponderance of the evidence the Respondents' application of the MPR was not 'reasonable and relevant' within the context of the AWPL and was a breach of the parties' contractual obligations." Levitt Decl., Exhibit A, Interim Award, at 14.

Motions," the Panel found, among other things, that AWPL applied and was enforceable through a breach of contract action, and the Agreement was a contract of adhesion. P. Exh. 27 at 7. The Arbitration proceeded to a five-day Final Hearing commencing on April 4, 2023.  Caremark called each witness of its choice, including leadership at Caremark and Aetna's president, Caremark's head pharmacist in charge of the DIR fee network, and the very architects of Caremark's DIR fee program.  The Panel evaluated each witness' credibility.

On June 28, 2023, the Panel returned its Interim Award in favor of NYCBS on Counts I, IV, VI, VII and IX. See Levitt Decl., Exh. A. The Panel awarded Claimant the full measure of its requested relief, $17,082,162 in damages, plus attorneys' fees/costs and interest. Id. at 34. The Interim Award reflects a thorough, careful and methodical analysis. Relying on the testimony of NYCBS's corporate representative, Dr. Jeffrey Vacirca, MD, and actuarial expert, Laura Coe, the Panel concluded that Caremark's MPR method for scoring patient adherence to oncology drugs was not "reasonable and relevant" in violation of both the AWPL and the parties' contract. Caremark's PNR Program "disregarded the inherent nature of oncology medications" by erroneously "assum[ing] that cancer patients will remain on drugs for a full calendar year…" Id. at 12.  The Panel relied upon key testimony from Caremark witnesses, none of whom could justify Caremark's performance metrics. The Panel remarked that "Caremark's scoring fails to account for the clinical realities of patient safety and quality of life and care, i.e., the 'floor,' which are attendant to oral oncolytics." Ibid. The Panel's conclusions followed five days of in-person testimony, allowing Petitions to call each witness and admit each piece of evidence.

The Panel also found that Petitioners' use of mean imputation to score adherence to non-specialty drugs violated the AWPL's "reasonable and relevant" standard and breached the parties'

agreement.[3] Id. at 14-15. Specifically, the mean imputation method "[struck] the Panel as directly contradictory to documentation which assures pharmacies that '[b]lank cells mean your pharmacy had zero or negligible volume. Your pharmacy is neither advantaged nor disadvantaged by this scenario." Ibid. "Also troubling to the Panel [was] the fact that the PNP was supposedly intended to allow individual providers to receive financial benefits tied to their individual performance." Ibid. However, "[Caremark] agreed that there was nothing NYCBS could do to increase its adherence scores in the non-specialty category." Ibid. For these reasons, the Panel ruled in favor of Claimant on Counts I, IV and VI.

As to Count VII (breach of the covenant of good faith and fair dealing), "Claimant proved by a preponderance of the evidence that Petitioners knew their metrics and calculations intentionally ignored the potential deleterious consequences to Medicare part D beneficiaries. Therefore, Claimant proved Caremark's bad faith or reckless indifference that their methodologies and actions with respect to oncology medications were not tenable." (internal citations omitted). Id. at 24-25.

As to Count IX (unjust enrichment), the Panel found that "Caremark knew that it could not '…develop criteria that will consistently and fairly measure…' adherence." Id. at 26; see also, Levitt Decl., Exh. C, at Bates CMK-NYCBS 4159. Further, Caremark understood that there was nothing NYCBS could do to improve adherence." Ibid. Failing until 2021 to disclose that "mean imputation" was used to measure adherence, Caremark "repeatedly assured program participants that they would be 'neither advantaged nor disadvantaged' by its methodology. Similarly, Caremark has not, to this day, provided NYCBS full details of the MPR calculation." (internal

---

[3] Caremark uses "mean imputation" to assign a score to pharmacies without actual measurable claims volume in the non-specialty adherence categories. See e.g., Pet.'s Ex. 15-D, Trimester Report, at 15. The contract documents state that the pharmacy will be "neither advantaged nor disadvantaged by this scenario." Ibid.

citations omitted). Id. at 26-27. Without disclosing the details surrounding the mean imputation and MPR methods, and with superior knowledge, Caremark "unfairly [tied] both of NYCBS' hands behind its back and [took] advantage of NYCBS' (and other providers') ignorance regarding how performance would be measured." Id. at 28. Accordingly, the Panel ruled in favor of NYCBS on Counts VII (breach of the implied covenant) and IX (unjust enrichment).

Caremark urged the Panel to limit NYCBS's damages to the difference between the amount of DIR Fees NYCBS actually paid and the amount NYCBS would have paid had it been the best performing pharmacy. See Pet.'s Ex. 25, Respondents' Post-Hearing Brief, at 32-34. The Panel expressly rejected this argument stating that "[t]he terms of the contract relating to the PNR program *failed and will not be enforced*" based on a failure of consideration that "directly relates to the PNP program…" Id. at 30-31 (emphasis added). The Panel held, among other things:

> **Caremark misrepresented the contractual terms by repeatedly failing to disclose its measurement methodologies, which it combined with its repeated, misleading assurances from the inception of the program.** Caremark touted the PNP Program, knowing full well that it would not fulfill its contractual promises. **It had superior knowledge, unfairly tying both of NYCBS' hands behind its back** and taking advantage of NYCBS' (and other providers') ignorance regarding how performance would be measured.
> ….
> [T]he consideration Caremark promised was financial reward tied to accurately measured individual performance, but the consideration it delivered was a financial reward based on flawed measurement criteria that, among other things: (1) were tired to the average performance of thousands of other providers, and (2) ignored the goal of promoting quality care for beneficiaries.
>
> **The bargained for consideration was material and substantial, but it was not delivered.** The failure to deliver the consideration agreed upon eviscerates the very foundation of the contract, the basis for inducing NYCBS' agreement. Levitt Decl., Exh. A, Interim Award, at 29 (emphasis added).

The Panel ultimately held the PNR Program was "unreasonable and unreliable," id. at 31 and, concluding that Caremark was unjustly enriched by and through the unlawful PNR Program, the Panel held that only a full return of the DIR fees would provide "just and equitable" relief in

accordance with AAA Rules (i.e., R-47), which are incorporated by reference into the parties' Arbitration Agreement. <u>See</u> Pet.'s Ex. 14-C, Caremark's Provider Manual, at 91.

## <u>PRELIMINARY STATEMENT</u>

Petitioners' Motion to Vacate the arbitration award is a thinly veiled attempt to relitigate the Panel's findings of fact, interpretation of the parties' contract, and conclusions of law. Caremark forces network providers into arbitration, requires a panel of three arbitrators, stacks the agreement in its favor, states in the agreement that the arbitration award is final and binding, but then routinely refuses to pay arbitration awards. The burden rests with Petitioners to show that the Panel exceeded their authority, violated public policy, or manifestly disregarded well-established and controlling law. Petitioners cannot carry this heavy burden.

First, the Panel carefully reviewed the evidence and testimony presented determined that the PNR Program's terms were unlawful and therefore unenforceable, and that Caremark failed to deliver the consideration the parties agreed upon. <u>See</u> Levitt Decl., Exh. A, at 30-31. For that reason, the Panel rejected Caremark's theory of damages limiting NYCBS's recovery to the DIR fees actually paid and the DIR fees NYCBS would have paid if it was the "best performing" pharmacy. <u>Ibid.</u> Petitioners disagree with the Panel's application of legal principles to the case, and now contend the Panel has re-written the parties' contract. P. Br. at 13. The Panel did not rewrite the contract. As set forth herein, the Panel was authorized under the parties' agreement and applicable law to refuse to enforce certain terms of the parties' agreement, including those governing Caremark's PNR Program, and to award damages in restitution for the failure of consideration supporting the agreement.

Petitioners also contend the Panel violated the public policy of CMS and the New York State Education Department ("SED") by finding the AWPL applied to NYCBS. P. Br. 15-18. This

argument misstates the law. The principle that courts may vacate awards that violate public policy "is derived from the common law doctrine of refusing to enforce a contract that violates law." Pro's Choice Beauty Care, Inc. Local 2013, United Food and Commercial Workers, 2017 WL 933089, at *2-3 (E.D.N.Y. Mar. 7, 2017). The "laws or legal precedents" at issue must be "well-defined and dominant." Ibid. Petitioners have failed to identify a single law or binding legal precedent, much less a "well-defined and dominant" law, that will be violated if the Panel's award is enforced. The Court should therefore reject Petitioners' meritless public policy argument.

Finally, Petitioners offer several grounds for vacating the Panel's award based on manifest disregard of the law. P. Br. 19. But Petitioners fail to offer any "well defined, explicit, and clearly applicable" law that the Panel refused to apply, despite knowing that the law controlled the outcome of the case. See Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 209 (2d Cir. 2002). The Panel's conclusions of law were not only correct, but also colorable – which is all a court requires to confirm the arbitration awards. Id. at 218.

Petitioners' Motion to Vacate is, essentially, an application for trial *de novo*, because Petitioners ask this Court to overturn the Panel's findings of fact and legal conclusions.  But by choosing to submit all disputes to "final and binding" arbitration, Pet.'s Ex. 14-C, at 91, Petitioners agreed to accept "the arbitrator's view of the facts and of the meaning of the contract[.]" United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987). Petitioners cannot leverage Section 10 of the FAA as a means for an improper second bite at the apple. For these reasons, the Court should deny Petitioner's Motion to Vacate the Panel's arbitration award.

## LEGAL STANDARD

The Federal Arbitration Act (FAA) was enacted to displace "judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal

footing with all other contracts.'" Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 581 (2008) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006)). Accordingly, there is "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001). The Second Circuit acknowledged that "it is difficult to overstate the strong federal policy favor of arbitration, and it is a policy we have often and emphatically applied." Arciniaga v. General Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006). Caremark unilaterally selected AAA arbitration contained within hundreds of pages of contract documents with NYCBS having the ability to negotiate not one single word.

Subject to these bedrock principles, FAA's Section 10 authorizes courts to "make an order vacating [an arbitration] award upon the application of any party to the arbitration[.]" 9 U.S.C. § 10(a). The ground for vacatur under Section 10 relevant here is "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Id. In addition, the Second Circuit recognizes that an arbitrator's "'manifest disregard' of the law or of the terms of the arbitration agreement '[is] a valid ground for vacating arbitration awards.'" Seneca Nation of Indians v. New York, 988 F.3d 618, 625-26 (2d Cir. 2021). None of these grounds exist to vacate.

Petitioners bear a heavy burden, "as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." Stolt-Neilsen SA v. AnimalFeeds Intern. Corp., 548 F.3d 85, 91-92 (2d Cir. 2008) (quoting GMS Group, LLC v. Benderson, 326 F.3d 75, 81 (2d Cir. 2003)). Courts routinely uphold arbitration awards "so long as 'the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract.'" Schwartz v. Merrill Lynch & Co., 665

F.3d 444, 451-52 (2d Cir. 2011). To prevail on the "manifest disregard" theory, "[a] petitioner must make a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." Ibid. (internal quotations and citations omitted). Moreover, "a finding of manifest disregard requires an objective determination that the disregarded legal principle was 'well defined, explicit, and clearly applicable.'" Westerbeke, 304 F.3d at 209 (internal quotation marks omitted). Petitioners have not carried this heavy burden.

## LEGAL ARGUMENT

I.   **This Court Should Deny Caremark's Motion to Vacate Because the Panel Was Well Within Their Authority to Invalidate the Terms of Caremark's PNR Program and Order Caremark to Return All DIR Fees.**

The Panel held that Caremark's PNR Program was invalid as it related to NYCBS and, therefore, that the proper measure of damages was a full return of all DIR fees. Caremark complains the Panel exceeded its authority by awarding NYCBS damages of $17,082,162 because NYCBS "knew it would pay *some* PNR" and, thus, argues NYCBS' damages should have been limited to the difference between PNR actually paid and PNR NYCBS would have paid had it received the highest possible score. See P. Br. at 13. That is not consistent with the evidence presented and heard by the Panel. Caremark's argument does not form a valid basis for vacating an award.

As a factual matter and contrary to Caremark's contention, NYCBS did not merely place at issue the highest 2% of the DIR fee variable range network range in Caremark's networks. P. Br. at 13. Rather, NYCBS challenged the *entire* PNR Program as unlawful and unenforceable. See Levitt Decl., Exh. D, at 35 (seeking declaration "that Caremark's PNR Program is unconscionable and therefore unenforceable"). Thus, while the parties agreed that contracts existed, Claimant

challenged the enforceability of the PNR Program's terms and conditions. The Panel held in NYCBS's favor and refused to enforce the terms of the PNR Program because Caremark did not deliver the bargained-for considerationand, thus, "eviscerate[d] the very foundation of the contract." Levitt Decl., Exh. A at 29.

The Panel was well within their authority to refuse to enforce the PNR Program's terms and conditions because of improper and secretive use of both MPR and mean imputation, and penalizing NYCBS for good patient care, and to award damages. "When a [party's] legal challenge is that a contract as a whole is unenforceable, the arbitrator decides the validity of the contract, including derivatively the validity of its constituent provisions...." Global Tech Industries Group, Inc. v. Go Fun Group Holdings, Ltd., 2022 WL 16949863, at *2 (S.D.N.Y. Nov. 14, 2022); Curry v. Volt Info. Sciences, Inc., No. 07 Civ. 7158 (DLC), 2008 WL 719214 (S.D.N.Y. Mar. 18, 2008) ("Because Curry's challenge is to the contract as a whole, his arguments against enforceability … must be decided by the arbitrator"). In addition, courts routinely invalidate contract terms that are unlawful. See e.g., Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 843 (2d Cir. 1952) ("a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable"). Moreover, the Panel's refusal to enforce the PNR Program's terms, and to award, as "just and equitable relief" (Levitt Decl., Exh. A at 31) the total amount of PNR fees is supported by the plain language of the arbitration provision.

The critical inquiry is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." Salus Capital Partners, LLC v. Moser, 289 F.Supp.3d 468, 477 (S.D.N.Y. 2018) (quoting United Paperworkers, 484 U.S. at 38). Here, the arbitration agreement states the parties must submit "*[a]ny and all disputes* between Provider and Caremark …

including, but not limited to, *disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks*" to binding arbitration "pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures[.]" <u>See</u> Pet.'s Ex. 14-C, at 91. The AAA Rules are broad and support the award of "just and equitable" relief. Levitt Decl., Exh. A at 31 (citing AAA Rule 47).

Under the AAA Rule 47, expressly incorporated by reference into the contract unilaterally drafted by Caremark, arbitrators may "grant **any relief that the arbitrator deems just and equitable** and within the scope of the parties' agreement…." Pet.'s Ex. 28 (emphasis added). The Agreement itself does not limit equitable remedies; the only remedies it limits are "indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by Law." P. Exh. 14-C at 91. The Panel's award of restitution is consistent with applicable law, the arbitration agreement, and AAA rules.

In <u>Moser</u>, this Court held the parties' arbitration agreement covering "any controversy or claim arising out of this Agreement" and incorporating the AAA Rules was sufficiently broad to authorize the arbitrator to fashion "such remedies as they deem appropriate." <u>289 F.Supp.3d at 477</u> (quoting <u>ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life. Co.</u>, 564 F.3d 81, 117 (2d Cir. 2003) ("Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate")). Here, and consistent with <u>Moser</u>, the Panel understood the broad arbitration clause to include the award of such damages they determined were "just and equitable." Based on the Panel's "conclusion, buttressed by the credible testimony of NYCBS' expert Laura Coe, …that the application of the PNR program to NYCBS was unreasonable and unreliable," the proper remedy, permitted under both the parties' agreement and AAA Rules, was full return of

PNR fees. Levitt Decl., Exh. A at 31. Accordingly, the parties' arbitration agreement is sufficiently broad as to authorize the Panel to fashion this remedy. Attempting to avoid the clear outcome to which <u>Moser</u> and other cases must lead, Petitioners rely on several inapposite cases.

None of the cases cited by Petitioners preclude arbitrators from awarding restitution . Instead, Petitioners' authorities hold that arbitrators may not "re-write" the terms of the parties' contract. In <u>PMA Cap. Ins. Co. v. Platinum Underwriters Bermuda, Ltd.</u>, 400 Fed. App'x. 654, 656 (3d Cir. 2010), the Third Circuit affirmed the district court's order finding that the arbitrators exceeded their authority "by ordering unrequested relief and rewriting material terms of the contract they purported to implement …" <u>Ibid.</u> The NYCBS Panel did not order unrequested relief or rewrite the contract; instead, the Panel declined to enforce such terms and conditions that were not supported by consideration and were unlawful, and to provide the appropriate relief pursuant to the power vested in them by the  agreement Caremark drafted. Thus, <u>PMA Cap. Ins.</u> is inapplicable.

Petitioners cite to <u>Collins & Aikman Floor Coverings Corp. v. Froehlich</u>, 736 F.Supp. 480, 484 (S.D.N.Y. 1990), holding the arbitrator exceeded her authority by awarding damages that accrued after the effective date of respondent's termination, because this directly violated the parties' agreement. <u>Id.</u> Here, the NYCBS Panel did not violate any express limitation on damages provision, differentiating from <u>Collins</u>. Instead, the NYCVS Panel held certain terms in the parties' contract were unenforceable, and awarded damages based upon equitable legal principles not limited by the contract. Therefore, <u>PMA Cap. Ins.</u>, <u>Froehlich</u> and the other cases Petitioners rely upon are inapplicable.

Caremark's arguments have been rejected in other DIR fee arbitration confirmation cases. The District of Arizona rejected Caremark's precise argument here. <u>See</u> <u>Mission Wellness</u>

Pharmacy LLC v. Caremark LLC, 2023 WL 4136606, at *4 (D. Ariz. June 22, 2023); see also
Caremark LLC v. AIDS Healthcare Found., 2022 WL 4267791, at *1 (D. Ariz. Sept. 15, 2022)
(denying Caremark's Motion to vacate on similar bases). The NYCBS Panel went further than the
Mission Wellness arbitrator in its considerate analysis of the PNR program. The Panel determined
that because the entire program was fatally flawed, the only available remedy was a full return of
all PNR fees—same result as Mission Wellness, just a more detailed legal and factual analysis.
The NYCBS Panel's remedy was well reasoned and in accordance with the parties' Agreement.
Accordingly, the Court should deny Caremark's Motion.

II.     **The Arbitration Award Does Not Compel the Violation of Public Policy Because There
        is no Applicable Well-Defined and Dominant Public Policy to Violate.**

The Award does not violate public policy. The principle that courts may vacate awards that
violate public policy "is derived from the common law doctrine of refusing to enforce a contract
that violates law." Pro's Choice Beauty Care, Inc. Local 2013, United Food and Commercial
Workers, 2017 WL 933089, at *2-3 (E.D.N.Y. Mar. 7, 2017). Caremark's burden is to show that
the award "violates some explicit public policy" that is "well-defined and dominant, as is to be
ascertained by reference to the laws and legal precedents and not from general considerations of
supposed public interests." W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (1987). To
vacateon this basis, the award must create an "explicit conflict with other 'laws and legal
precedents' rather than an assessment of 'general considerations of supposed public interests.'"
Misco, 484 U.S. 29 at 43. Petitioners fail to mention, much less satisfy this standard.

A.      **The Panel's Ruling That NYCBS is Protected Under the AWPL Does Not
        Violate a Well-Defined and Dominant Policy Articulated by CMS.**

The Panel's decision that NYCBS qualifies as a "pharmacy" subject to the AWPL does not
violate a "Well-Defined and Dominant" Policy Articulated by CMS. Petitioners place undue

weight in a January 6, 2017 CMS letter which states, among other things, that "***[c]urrent guidance is silent on the issue of inclusion of non-pharmacy dispensing sites in Part D networks***." Pet.'s Ex. 29 (emphasis added). A plain reading of the letter fails to articulate a "well-defined and dominant" policy of CMS to exclude dispensing providers from Medicare Part D and protection of the AWPL. CMS's comment that "[c]urrent guidance **is silent** on the issue of inclusion of non-pharmacy dispensing sites in Part D networks" and that CMS was re-evaluating the existing Part D regulations demonstrates that CMS's "policy" surrounding participation of physician dispensing practices is not "well-defined" or "dominant" as required to set aside an award on public policy grounds. W.R. Grace, 461 U.S. at 766. Caremark cites 83 FR 16593, as proof "CMS declined to issue any rules in response to comments requesting that it "expand [its] definition of 'network pharmacy' and interpretation of 'any willing pharmacy' to include dispensing physicians . . . ," P. Br. at 17. That quote, in context, only demonstrates CMS rejected commenters' request to expand definitions of "network pharmacy" and "any willing pharmacy" *only* because the proposed rule at issue did not concern those definitions. See 83 FR 16593.[4] Specifically, CMS's response was that the particular comment was outside the scope of the rule and would not comment on whether dispensing practices are or are not protected by the AWPL. There is zero support for the proposition that physicians are not covered by the AWPL.

A noteworthy case applying the relevant standard is Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp., 143 F.3d 704 (2d Cir. 1998). In that case, the Second Circuit reviewed whether a district court erred in vacating an arbitration award on public policy grounds based on nuclear safety regulations; specifically, whether an award reinstating an employee of a nuclear facility who had adulterated a drug test was against public policy. In holding the award did

---

[4] The proposed rule at issue dealt solely with the definitions of "retail pharmacy" and "mail order pharmacy". See 83 FR 16440 at 16592.

not violate public policy, the Second Circuit found that while there was a dominant and well-defined policy requiring strict adherence to nuclear safety rules, nothing in the Nuclear Regulatory Commission regulations—which did in fact regulate employee drug testing—indicated the employee must be permanently removed from his position for an adulterated or positive drug test. Id. at 718.  Because there was no conflict between the regulations and the decision, the district court had exceeded its authority by vacating the Award on these grounds.  Ibid. Here, no regulations or CMS guidance are so well-defined and dominant on the topic of AWPL's applicability to physicians that dispense, that the Panel's decision can be overturned on public policy grounds.

Indeed, even Caremark has treated dispensing practices as pharmacies for purposes of Part D participation. On September 27, 2016, Caremark terminated dispensing practices from participation in its Part D network because, in its view, dispensing practices were not included in the definition of "retail pharmacy" in Chapter 5 of the Medicare Prescription drug Benefit Manual. See Levitt Decl., Exh. E. However, on October 28, 2016, Caremark reversed course "based on ongoing dialogue with CMS" and continued to allow dispensing practices to participate in its Part D networks. See Levitt Decl., Exh. F. Caremark has not sought to exclude dispensing practices from participating in Part D networks since, as the Panel found and ruled upon after briefing and oral argument on the issue. Caremark certainly cannot point to any regulation or guidance that conflicts with dispensing practices' participation and, therefore, cannot show that the Award violates public policy.  Lastly, Caremark's own contract with NYCBS incorporates the AWPL expressly at _____.

Thus, Caremark's argument that the Panel's Award ignored CMS's policy on dispensing practices participating in Medicare Part D is without merit, and the Court should deny Caremark's

Motion.

**B.  The Panel's Ruling That NYCBS is Protected Under the AWPL Does Not Violate a Well-Defined and Dominant Policy Articulated by New York**

Petitioners also argue that the Panel's Award finding that NYCBS should be considered a pharmacy for purposes of the AWPL violates the New York State Education Department's ("SED") regulatory authority, pointing to legal briefs concerning state Medicaid regulations in support. But these briefs are completely irrelevant to whether the AWPL (a Medicare Part D provision) applies to NYCBS. Caremark charged NYCBS with improper DIR in Medicare Part D, not Medicaid. Medicare is government by CMS, not New York State. Moreover, Petitioners have not explained how SED's legal arguments made in ongoing litigation regarding Medicaid (not Medicare Part D) constitutes binding law or legal precedent that controlled the outcome of the parties' Medicare dispute. The notion that courts may vacate awards on public policy grounds derives from the general principle that courts may invalidate awards that conflict with "laws and legal precedents." Pro's Choice Beauty Care, Inc. Local 2013, United Food and Commercial Workers, 2017 WL 933089, at *2-3 (E.D.N.Y. Mar. 7, 2017) (emphasis added). Petitioners fail to satisfy this standard. Accordingly, the Court should deny the Motion.

**III.  The Panel did not Manifestly Disregard the Law Because They Did Not "Appreciate but Ignore" the Law.**

Caremark has not carried its significant burden to demonstrate the Panel ignored law they knew must apply. Parties seeking to vacate an award based on the manifest disregard standard must demonstrate the arbitrator "appreciates the law but nonetheless ignores it." Westerbeke, 304 F.3d at 209. "[A] party seeking vacatur on the basis of manifest disregard of the law 'must clear a high hurdle….'" Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Comm. of Bayou Grp., LLC, 758 F. Supp. 2d 222, 225 (S.D.N.Y. 2010) (quoting Stolt-Nielsen S.A. v.

AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010)). "Indeed, vacatur on this basis can succeed only in 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent.'" Ibid. (quoting Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 389 (2d Cir. 2003)). "Conversely, the award must be enforced 'if there is a barely colorable justification for the outcome reached.'" Ibid. (quoting Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004)). "Moreover, the facts of record must be construed most favorably to the prevailing party and the arbitration panel's implicit factual findings are not subject to any review whatsoever." Ibid. Petitioners cannot meet this exceeding high burden.

A.   The Panel's Determination that NYCBS Could Proceed With its Breach of Contract is a Permissible Interpretation of Law and Consistent with Other DIR Fee Awards Against Caremark, Confirmed by Federal Courts.

Petitioners argue that the Panel had no basis for allowing NYCBS to allege breach of contract predicated upon Caremark's violation of the AWPL because the AWPL lacks a private right of action. Petitioners argue that the Panel incorrectly relied on Trone Health Servs., Inc. v. Express Scripts Holding Co., 974 F.3d 845 (8th Cir. 2020) because the contract at issue in Trone explicitly incorporated HIPAA whereas, here, the parties' contract does not expressly incorporate the AWPL. P. Br. at 20. However, Trone's rationale did not depend on the fact that HIPAA was "directly referenced" in the contract, but on the theory that a lack of private right of action in a statute does not preclude a breach of contract action where "federal statutes [] supply the standards of conduct or legal duties whose breaches form the basis for state common law claims even when those federal statutes do not themselves permit any private right of action." Trone, 974 F.3d at 851; see also ibid. n.4 (collecting cases).  Thus, the Panel concluded that the AWPL could form the basis of a breach of contract claim, because "a contrary finding would require the 'novel presumption'

that when Congress provides no remedy, neither can state law." P.'s Ex. 27 at 7.

More importantly, Petitioners' argument ignores the standard of review"The interpretations of the law by the arbitrators in contrast to manifest disregard **are not subject, in the federal courts, to judicial review for error in interpretation**." <u>Hamerslough v. Hipple</u>, 2012 WL 5290318, at *4 (S.D.N.Y. Oct. 25, 2012) (quoting <u>Wilko v. Swan</u>, 346 U.S. 427, 436-37, (1953), <u>overruled on other grounds by</u> <u>Rodriguez de Quijas v. Shearson/Am. Exp., Inc.</u>, 490 U.S. 477 (1989)). Thus, even if this Court agreed the Panel misinterpreted <u>Trone</u>, which it did not, the Court should still deny Petitioners' Motion.[5]

 Petitioners next argue that Arizona and New York law expressly prohibit common-law claims based on the violation of statutes containing no private rights of action. Petitioners' cases are distinguishable. Petitioner cites to <u>Gunther</u>, where the Court rejected plaintiff's attempt to enforce the Truth In Savings Act ("TISA") through a breach of contract action.  There, Congress *expressly* stated that TISA **should be enforced only by public entities**. <u>Gunther v. Capital One, N.A.</u>, 703 F.Supp.2d 264, 271 (E.D.N.Y. 2010). Conversely, as to Medicare Part D, CMS has expressed that disputes regarding whether terms and conditions are reasonable and relevant under the AWPL are "best left between the parties". <u>See</u> Levitt Decl., Exh. G (Chapter 5 of the Medicare Part D Prescription Drug Benefit Manual).  Literally the opposite of <u>Gunther</u>.

Petitioners cite to <u>Broder</u>, where plaintiff sought to apply 47 U.S.C. § 543(d), which mandates cable service providers to charge uniform rates, through a customer agreement. <u>Broder v. Cablevision Sys. Corp.</u>, 418 F.3d 187, 197 (2d Cir. 2005). However, the actual contract provision between the parties stated "not that rates are <u>subject to</u> applicable law, but that rates are <u>subject to</u>

---

[5] In a conspicuous omission, Petitioners fail to address the Panel's holding they violated the covenant of good faith and fair dealing, which supplies an alternate basis for liability, thereby mooting any concerns regarding whether the AWPL is enforceable through a breach of contract.  Levitt Decl., Exh. A at 23-25.

change in accordance with applicable law." Ibid. (emphasis in original). Thus, the contract did not incorporate the "uniform rate" requirement of 47 U.S.C. § 543(d). Moreover, because the plaintiff "d[id] not complain of a change in rates," there was no breach of contract claim. Ibid. NYCBS, to the contrary, argued and the Panel agreed that Caremark expressly incorporated the AWPL into the parties' agreement and bound Petitioners, Pet.'s Ex. 27 at 4.[6]  The NYCBS Panel concluded that "Caremark is contractually bound to follow the AWPL." Id. at 6. Broder is distinguishable.

Similarly, the Court should reject Petitioners' reliance on Ansley, Wright, and Bullock. In Ansley, plaintiffs sought to enforce Medicaid regulations through a contract to which they were not party. Ansley v. Banner Health Network, 248 Ariz. 143, 151 (2020). The Wright court dismissed plaintiff's complaint alleging breach of contract based upon defendants' violation of the [Home Affordable Mortgage Program] because "plaintiff [failed to] identify what specific provisions were breached." Wright v. Chase Home Finance LLC, No. 11-cv-95, 2011 WL 2173906, at *2 (D. Ariz. June 2, 2011). Finally, Bullock is distinguishable because plaintiff never alleged breach of contract predicated on a violation of the Davis-Bacon Act. Bullock v. U.S., 883 F.2d 1023, *1 (9th Cir. 1989). In short, none of these cases are applicable.

Petitioners have not proven the Panel "appreciate[d] the law but nonetheless ignore[d] it," Westerbeke, 304 F.3d at 209, and thus Petitioners' Motion fails.

**B.    The Panel's Refusal to Adopt Petitioners' Interpretation of the Noninterference Clause Does Not Qualify as a Manifest Disregard of Law because the Panel did not Appreciate the Law but Ignore it.**

The Panel properly rejected Petitioners' interpretation of the noninterference clause. The noninterference clause states that HHS and CMS "may not interfere with the negotiations between drug manufacturers and pharmacies and PDP sponsors." 42 U.S.C. § 1395w-111(i). Ironically, the

---

[6]  In fact, pursuant to 42 C.F.R. §423.505(i)(3)(iii, iv), Caremark is required to incorporate the AWPL into all Agreements with providers.

PDP sponsors here agreed and in fact contractually required Caremark to follow the AWPL. However, CMS itself has stated that it does not read the noninterference clause as preventing it from requiring "the inclusion of terms and conditions in agreements when necessary to implement requirements under the Act." 79 Fed. Reg. 1918-01 at 1971. As CMS points out, Congress has charged CMS with enforcing many contractual requirements including, but not limited to, "[i]nterpretation of what 'access to negotiated prices' means, ***any-willing-pharmacy standard terms and conditions***, prohibition on any requirement to accept rise, prompt payment, and payment standard update requirements." Ibid. (emphasis added). Petitioners not only ignore the full scope of CMS's authority under the noninterference clause, they also failed to establish that their interpretation is "well defined, explicit, and clearly applicable.'" Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 209 (2d Cir. 2002). The Panel did not manifestly disregard the law by rejecting Petitioners' flawed and incomplete interpretation of the noninterference clause and, regardless, Petitioners cannot prevail on their Motion based upon a disagreement with the Panel's interpretation of law. Hipple, 2012 WL 5290318, at *4.

Petitioners suggestion that the Panel was without authority to hold Petitioners liable for violating the AWPL because "HHS and CMS are ultimately responsible for enforcing the AWPL," P. Br. at 22, is misguided. CMS has expressly stated that "whether a Part D sponsor has permitted pharmacy an opportunity to participate in its network" pursuant to reasonable and relevant terms and conditions is a "**fact-specific question[ ] that [is] generally best left between the parties**." See Levitt Decl., Exh. G (emphasis added). Caremark selected "binding arbitration" to resolve disputes. The standards established under the AWPL may, if violated, form the basis for breach of contract claims. Petitioners fail to show that the Panel manifestly disregarded the law by merely

rejecting Petitioners' incorrect interpretation of the noninterference clause.

**C.    The Panel's Determination That NYCBS Is a "Pharmacy" For Purposes of the AWPL Was Fact-Specific and Therefore Not Subject to Review.**

Petitioners argue the Panel manifestly disregarded CMS and SED authority when they found that NYCBS was a pharmacy protected by the AWPL. The Panel's determination as to whether NYCBS is a pharmacy for AWPL purposes was based upon substantial discovery including, but not limited to, contract documents showing that Caremark "consistently referred to [NYCBS] as a pharmacy" in connection with NYCBS' participation in Caremark's Part D networks. See Pet.'s Ex. 27 at 4-6. Pharmacies dispense drugs.  New York law permits oncologists to dispense drugs, which is why Caremark permitted NYCBS into their "pharmacy network." N.Y. Educ. Law § 6807(2)(a)(9). The Panel ruled, "based upon the relationship of the parties here, Claimant should be defined as a pharmacy within the meaning of the AWPL." Ibid.  Because the "the facts of record must be construed most favorably to the prevailing party and the arbitration panel's implicit factual findings are not subject to any review whatsoever," the Court should deny the Motion. Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004).

**D.    The Panel Did Not Manifestly Disregard the Law by Awarding NYCBS Restitution Damages While Also Finding That Caremark Breached the Contract.**

1. The Panel's Award of Restitution Damages is Proper Because Claimant's Unjust Enrichment is Claim is Not Duplicative of Counts I, IV and VI

The rule barring quasi-contract claims where a valid and enforceable contract exists does not apply here. While an "unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim," Hassan v. Fordham University, 533 F.Supp.3d 164, 169-70 (S.D.N.Y. 2021), Respondent's/NYCBS's unjust enrichment claim does not duplicate its breach of contract claims. Indeed, Count I alleges that Caremark violated its agreement to comply

with all applicable laws, including the AWPL. <u>See</u> Levitt Decl., Exh. A, at 10. Count IV alleges Caremark violated its agreement to not disadvantage Claimant through its administration of the PNR Program. <u>Id.</u> at 19. Finally, Count VI alleges that Caremark breached the contract by failing to accurately measure NYCBS' performance in accordance with NYCBS' reasonable expectations. <u>Id.</u> at 21. Each count represents an independent contractual obligation that Caremark violated. Most importantly, none of the contractual provisions violated by Caremark by their terms entitle NYCBS to recover the full amount of DIR Fees assessed; to the contrary, the contract imposed the unlawful fees in the first place. Accordingly, the subject matter of NYCBS' unjust enrichment claim is not covered by a valid, enforceable contractual obligation. <u>Spirit Locker, Inc. v. EVO Direct, LLC</u>, 696 F.Supp.2d 296, 304-05 (E.D.N.Y. 2010). <u>Spirit Locker</u> is instructive.

In <u>Spirit Locker</u>, the plaintiff and defendant contractually agreed to process plaintiff's credit card transactions for a three-year term. <u>Id.</u> at 297-98. The agreement, prepared entirely by defendant, required plaintiff to pay an early termination fee (ETF) if plaintiff terminated the agreement before the three-year period expired. Plaintiff cancelled before the three-year term expired and defendant imposed the ETF, which was automatically debited from plaintiff's account. Plaintiff sued defendant for, among other things, unjust enrichment on the grounds that the ETF was an unlawful penalty. Defendant moved to dismiss plaintiff's unjust enrichment claim arguing that "even if the ETF provision is unlawful, there remains a valid and enforceable contract between the parties." <u>Id.</u> at 304. The court acknowledged that while the parties entered into a valid and enforceable agreement, the rule "that a performing party may not bring an unjust enrichment action where he has a valid contractual claim" does not apply when the complaining party seeks to recover a fee (e.g., the ETF) where a contract term was unlawfully imposed and does not allow plaintiff to recover. <u>Id.</u> at 305. As in that case, here, the PNR fees were, like the ETF, unlawful fees that the

contract does not otherwise allow NYCBS to recover in the absence of the equitable remedy awarded by the Panel. Therefore, that the parties have a valid and enforceable agreement does not bar NYCBS from recovering for unjust enrichment.

> 2. <u>The Award Does Not Manifestly Disregard Law Because it Has More Than a Colorable Basis.</u>

Courts will not vacate an arbitral award so long as it has a "barely colorable" basis in law. <u>Schwartz</u>, 665 F.3d at 451-52. As applied here, not only is the Panel's award of restitution appropriate despite the parties' agreement, the Panel's reasoning for awarding restitution to NYCBS rested on sound legal principles applied to the facts in a 34-page Interim Award signed by all three arbitrators following a 5-day hearing concluding a 20-month arbitration with pre and post-hearing briefing.  The Panel reasoned that Caremark's misrepresentation of its MPR measurement methodologies and its "repeated, misleading assurances" amounted to a failure of consideration and misrepresentation sufficient to warrant an award of restitution. Levitt Decl., Exh. A at 29. The Panel's reasoning is more than "colorable" and Petitioners have not put forth any basis for concluding otherwise. Thus, this Court should deny Caremark's Petition to Vacate.

> 3. <u>Petitioners Failed to Demonstrate that the Panel Knew of the Relevant Principle, Appreciated that this Principle Controlled the Outcome, and Nonetheless Refused to Apply Such Principle.</u>

The manifest disregard standard does not apply where the arbitrator acknowledges a legal principle but concludes that the principle is not controlling, as the Panel did here. <u>Westerbeke Corp.</u>, 304 F.3d at 217-18. It is not enough for the arbitrator to know of the relevant principle and refuse to apply it. Rather, the arbitrator must "[know] of the relevant principle, *[appreciate] that this principle controlled the outcome of the disputed issue, and nonetheless willfully [flout] the governing law by refusing to apply it*." <u>Ibid.</u> Petitioners contend that the legal principle barring unjust enrichment claims where the parties have a valid and enforceable contract controlled the

outcome. However, Petitioners failed to establish the "subjective" element of the manifest disregard standard; that is, that the arbitrator "appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it." <u>Id.</u> at 209. Indeed, if nothing else, the Panel *did not* believe that the existence of the parties' agreement barred NYCBS' unjust enrichment claim. <u>See</u> Levitt Decl., Exh. A, at 28. ("While unjust enrichment cannot be used to contradict the express terms of a contract, it can be used to provide restitution where there is a showing that the [Caremark, SilverScript and Aetna were] enriched at NYCBS' expense through the operation of some unjust factor…"). Accordingly, Petitioners failed to make the requisite showing to support a finding that the Panel manifestly disregarded controlling law.

4. <u>Petitioners Failed to Meet Their Burden of Proving that the Panel Knew of Controlling Law Prohibiting it From Awarding NYCBS Damages in the Amount of $17,082,162 But Nevertheless Refused to Apply that Particular Law.</u>

Petitioners contend the Panel manifestly disregarded the law by awarding damages in violation of New York and Arizona law. As support, Petitioners incorporate by reference their arguments in Part I of their Petition. However, for the reasons set forth in Part I herein, Petitioners' complaints regarding the Panel's damages award are meritless. More specifically, and as it applies to the manifest disregard standard, Petitioners have not referenced any controlling legal principle prohibiting an arbitrator from awarding restitution damages in these circumstances. Nor have Petitioners established that the Panel was aware of that (non-existent) legal principle, knew that it controlled the outcome, but nonetheless refused to apply it. <u>Westerbeke</u>, 304 F.3d at 209. Therefore, Petitioners' argument must fail.

5. <u>Petitioners Failed to Identify a Well-Defined and Controlling Legal Principle Preventing the Panel From Denying Caremark's Unreasonable Request to Sever the</u>

Arbitration Into Several Individual Proceedings.

Petitioners contend that the Panel manifestly disregarded the law by consolidating the claims of multiple dispensing locations. NYCBS initiated arbitration as a single legal entity controlling seven dispensing locations. Early in the litigation, Petitioners requested that the Panel order NYCBS to identify a single location to continue the arbitration and to sever and dismiss all other pharmacy claims as impermissibly consolidated. See Pet.'s Ex. 27, at 3, 10-12. Petitioners claimed that the arbitration agreement's anti-consolidation provision required NYCBS to bring separate, individual arbitrations, all generating thousands of unnecessary attorney hours, resources, and expenses as opposed to one.[7] The parties conducted expedited discovery on this issue. See Levitt Decl., Exh. H, Scheduling Order #4, at 1. Based on the evidence presented and the parties' arbitration agreement, the Panel found that all the applicable agreements were signed by George Calcanes, an employee of NYCBS, and that NYCBS' independent pharmacy locations were not legal entities capable of suing or being sued. See Pet.'s Ex. 27, at 12. Based on those facts, the Panel concluded that "[NYCBS] properly asserted claims on behalf of the affiliated pharmacies." Ibid. Dissatisfied with this ruling, and without referencing any controlling legal principle that Panel supposedly disregarded, Petitioners now ask this Court to overturn the Panel's view of the facts and parties' agreement. Petitioners, once again, forget that they have agreed to accept "the arbitrator's view of the facts and of the meaning of the contract[.]" United Paperworkers, 484 U.S. at 37-38. Moreover, the Panel's factual findings on this matter are not subject to review. Westerbeke, 304 F.3d at 209. This Court should therefore reject Petitioner's argument.

## CONCLUSION

For these reasons, the Court should deny Petitioners' Motion to Vacate.

Dated: October 27, 2023

Respectfully submitted,

By: *Jonathan E. Levitt*
Jonathan E. Levitt
Todd Mizeski
Steven L. Bennet
A.J. Barbarito
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
tmizeski@frierlevitt.com
sbennet@frierlevitt.com
abarbarito@frierlevitt.com
*Counsel for Respondent New York Cancer*
*& Blood Specialists*

---

[7] The applicable anti-consolidation provision states, "[n]o dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action"). All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement." Pet.'s Ex. 14-C, at 91.