UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
CAREMARK, L.L.C., CAREMARKPCS,
L.L.C., CAREMARK IPA, L.L.C.,
SILVERSCRIPT INSURANCE COMPANY, and
AETNA, INC.

          Petitioners,

     - against -

NEW YORK CANCER & BLOOD SPECIALISTS,

          Respondent.
-----------------------------------X

**MEMORANDUM AND ORDER**

23 Civ. 8508 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Petitioners Caremark, L.L.C., CaremarkPCS, L.L.C., and Caremark IPA, L.L.C. (collectively, "Caremark") serve as a pharmacy benefit manager ("PBM") for numerous Medicare Part D plan sponsors, including petitioners SilverScript Insurance Company and Aetna, Inc. (together with Caremark, "petitioners"). Respondent New York Cancer & Blood Specialists ("NYCBS") is a medical practice that provides oncology treatments and, in certain locations, dispenses oncological medications to its patients. To dispense such medications to its patients who are Medicare beneficiaries, NYCBS entered into agreements with Caremark and joined several of its Part D pharmacy networks. Over the course of their relationship, Caremark began to assess fees on NYCBS if its patients did not adhere to taking oncology drugs prescribed to

them, even if the continued use of these highly toxic medications posed health risks to the patients.

Pursuant to the parties' agreement, NYCBS filed an arbitration demand against petitioners, challenging the assessment of these fees as well as the broader program through which these fees were assessed.  The arbitration panel eventually found in favor of NYCBS, awarding it $17,082,162, based on the panel's conclusion that "the application of [Caremark's] program to NYCBS was unreasonable and unreliable" and could be "remedied only by a full return of [the] fees" that NYCBS was required to pay. Petitioners thereafter filed this petition to vacate the panel's arbitration award.  NYCBS has cross-moved to confirm the award. For the following reasons, we deny petitioners' petition to vacate, grant NYCBS's cross-motion, and confirm the arbitration award.

**BACKGROUND**

**A.  Legal Framework**

Before turning to the facts at hand, a brief overview of the legal framework underlying this dispute is necessary.  We begin with Medicare, the federal government's health insurance plan for the elderly and certain persons with disabilities.  See 42 U.S.C. § 1395 et seq.  Medicare beneficiaries receive prescription drug

benefits through Medicare Part D ("Part D").  See id. § 1395w-101 et seq.  To provide Part D benefits to enrollees, the Center of Medicaid and Medicare Services ("CMS") contracts with private health insurers, known as Part D plan sponsors ("Plan Sponsors"), which, in turn, offer prescription drug plans to Medicare beneficiaries.  See United States, ex rel. Fox Rx, Inc. v. Dr. Reddy's Inc., No. 13 Civ. 3779 (DLC), 2014 WL 6750786, at *2 (S.D.N.Y. Dec. 1, 2014).

Although Plan Sponsors, which are often large insurance companies, offer Part D prescription drug plans directly to beneficiaries, the Plan Sponsors frequently delegate the administration of those plans to in-house or third-party pharmacy benefit managers ("PBMs") with the intent of "keep[ing] costs of prescription medications manageable."  In re Express Scripts/Anthem ERISA Litig., 285 F. Supp. 3d 655, 663 (S.D.N.Y. 2018).  "Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use."  Rutledge v. Pharm. Care Mgmt. Ass'n, 592 U.S. 80, 83-84 (2020).  In this role, PBMs "contract with pharmacies, negotiate discounts and rebates with drug manufacturers, review drug utilization, manage drug formularies, and process and pay prescription drug claims."  In re Express Scripts, 285 F. Supp. 3d

at 663.   For example, when a customer goes to a pharmacy to fill a prescription, the pharmacy is reimbursed by a PBM, which, in turn, seeks reimbursement from the Plan Sponsor ultimately responsible for the customer's prescription drug plan.   See Rutledge, 592 U.S. at 84.

In addition to administering prescription drug plans on behalf of Plan Sponsors, PBMs often create networks of pharmacies through which members can purchase medications at covered or discounted rates.   See Park Irmat Drug Corp. v. Optumrx, Inc., 152 F. Supp. 3d 127, 130 (S.D.N.Y. 2016).   To gain access to a PBM's network, pharmacies either negotiate with a PBM directly or contract with third-party Pharmacy Services Administrative Organizations ("PSAOs") that negotiate and contract with PBMs on the pharmacies' behalf.   See id.   With this framework, we now turn to the facts before us.

**B.   Factual Background**

NYCBS is a medical practice that provides, among other things, oncology treatments to nearly a million patients a year at more than thirty oncology locations.   See Declaration of Neil P. Diskin ("Diskin Decl."), ECF No. 18, Ex. 11 ("Vacirca Dep. II") 16:2-19. Six of these locations dispense oncological medications to NYCBS

-4-

patients, many of whom are Medicare beneficiaries. Diskin Decl., Ex. 2 ("Vacirca Dep. I") 14:21-15:6, 22:2-5.

Caremark serves as a PBM for thousands of insurers, including commercial health plans, self-insured employer plans, and, as relevant here, Part D Plan Sponsors, including petitioners SilverScript and Aetna. Diskin Decl., Ex. 1 ("Arbitration Tr.") 721:4-9, 1402:19-1403:4. Caremark has around 68,000 pharmacies enrolled in its various networks, including the NYCBS-affiliated dispensaries. Diskin Decl., Ex. 13 ("Hutchins Dep.") 31:19-23.

To distribute oncology medication to its Medicare patients, NYCBS entered into a Provider Agreement with Caremark for each of its dispensaries.[1] Vacirca Dep. I 22:10-23:3; see also Diskin Decl., Exs. 3-4, 7-10. Each Provider Agreement incorporates by reference the Provider Manual. See, e.g., Diskin Decl., Ex. 3 ¶ 11. Merely signing the Provider Agreement does not automatically give providers like NYCBS access to all of Caremark's pharmacy networks. See Declaration of Jonathan E. Levitt ("Levitt Decl."), ECF. No. 39, Ex. A ("Interim Award") at 2; ECF No. 17 ("Pet.") at 4. Rather, to join specific networks, providers must agree to

---

[1] As respondents note, Arizona law governs the contractual relationship for certain NYCBS-affiliated dispensaries while New York law governs the contractual relationship for the remaining dispensaries. See ECF No. 17 ("Pet.") at 4.

Network Enrollment Forms ("NEFs"), which set forth the reimbursement terms and conditions for each particular network. Vacirca Dep. II 44:1-45:19; Diskin Decl., Ex. 12 ("NYCBS NEFs"). Here, NYCBS retained a PSAO, Amerisource Bergen Drug Corporation ("Elevate"), to enroll it in the Part D networks and represent it in interactions with Caremark regarding the NEFs at issue. Arbitration Tr. 247:5-9, 277:7-22.

In 2016, Caremark established a Performance Network Rebate Program (the "PNR program") pursuant to which the amount of Caremark's reimbursement to providers of Medicare Part D drugs like NYCBS became contingent on the provider's performance. Id. 1254:3-22. The purpose of the PNR program, in Caremark's words, was to "recognize pharmacies for their performance." Id. 1254:13-18. Under this regime, Caremark began to assess providers direct and indirect remuneration fees (or "PNR fees") based on its performance score. See id.; Diskin Decl., Ex. 12-A at 30-31. The higher a provider scores in the PNR program, the lower the PNR fees it must pay to Caremark, and vice versa. Arbitration Tr. 257:8-258:13, 1254:16-22. Regardless of a provider's performance, under the PNR program, a provider must always pay Caremark some amount of PNR fees. That is, even if a provider receives a perfect performance score, it is still assessed the minimal amount of PNR

fees as set forth in the provider's agreement with Caremark.[2]  <u>See</u> <u>id.</u> 257:23-258:10; Vacirca Dep. II 58:5-59:23.

Calculation of a provider's PNR program score is complex and has changed over time.  From the outset, the performance score depended on factors such as medication adherence and gap theory. <u>See</u> Diskin Decl., Ex. 15-B at 2.  In 2018, however, Caremark introduced a new metric called "specialty medication adherence" that is at the heart of this dispute.  <u>See</u> Diskin Decl., Ex. 25 at 12.  This new component utilizes a medication possession ratio ("MPR"), which is intended to measure patients' adherence in taking "specialty drugs," including oncology drugs, that were prescribed to them.  <u>Id.</u> at 15; <u>see also</u> Interim Award at 4.  One potential concern with this measure, as will be discussed below, is that the high toxicity associated with oncology medication may require a pause or discontinuance to avoid serious adverse effects for the patients.  <u>See</u> Interim Award at 12.  However, the clinical decision to pause or discontinue the use of these drugs to protect patients'

---

[2] Notably, whatever the amount, the PNR fees are not paid up front.  Rather, once Caremark calculates a provider's score in the PNR program, it retroactively collects the PNR fees by withholding the provider's reimbursements in an amount corresponding to its PNR program score.  <u>See</u> Diskin Decl., Ex. 12-A at 30-31. For example, Caremark may calculate a provider's performance score for the period between January and August but not collect or recoup those fees until November of that year, effectively clawing back money that had already been reimbursed to the provider.  <u>See id.</u>; <u>see also</u> Vacirca Dep. I 16:12-19 (stating that Caremark "claws back money" from NYCBS "usually six to nine months [later]").

safety could result in a lower PNR program score, which would require the provider to pay Caremark higher PNR fees. See id. The specialty medication adherence component had a significant impact on NYCBS given that its dispensaries only prescribe specialty oncology drugs. See Arbitration Tr. 94:9-22. Indeed, between 2016 and the date of the final arbitration hearing, NYCBS had been assessed $17,082,162 in PNR fees. Interim Award at 30.

## C.  Procedural History

### 1. Arbitration Demand

On October 10, 2019, NYCBS filed a Demand for Arbitration with the American Arbitration Association ("AAA") against petitioners Caremark, SilverScript, and Aetna, primarily challenging Caremark's PNR program and PNR fee assessment. See Diskin Decl., Ex. 41 ("Third Am. Statement of Claims"). In its third and final amended statement of claims, NYCBS asserted nine causes of action, namely: (1) violation of the federal Any Willing Provider Law ("AWPL"), 42 U.S.C. § 1395w-104(b)(1)(A), 42 C.F.R. § 423.505(b)(18); (2) violation of New York Public Health Law § 4406-c; (3) improper assessment of PNR fees on inapplicable claims; (4) breach of contract for assessing PNR fees; (5) violation of the federal Prompt Pay Law; (6) failure to properly

measure NYCBS's performance scores (asserted against Caremark alone); (7) breach of implied covenant of good faith and fair dealing; (8) conversion; and (9) unjust enrichment.  Id. ¶¶ 90-166.  As for relief, NYCBS requested, among other things, (1) a declaration that Caremark's imposition of PNR fees is a breach of the parties' agreement; (2) a declaration that Caremark's PNR program is unconscionable and thus unenforceable; (3) compensatory and consequential damages in an amount up to $16,000,000; and (4) "[s]uch other relief deemed just and proper."  See id.

**2. Order No. 7**

To resolve several preliminary issues, the parties agreed to file omnibus motions.  See Interim Award at 4-5.  Following briefing and oral argument on those motions, the arbitration panel (the "Panel") held, in relevant part, that (1) the AWPL applies to all three petitioners; (2) NYCBS may maintain a cause of action for a claimed violation of the AWPL; (3) the parties' agreement constituted a contract of adhesion; and (4) NYCBS is properly considered one dispensing pharmacy that may consolidate its claims into a single arbitration.  See Diskin Decl., Ex. 27 ("Order No. 7") at 6-12.

**3. Arbitration Award**

The Panel held a five-day hearing beginning on April 3, 2023, during which ten witnesses testified.    See Interim Award at 7, 34.    On June 28, 2023, the Panel issued a 34-page Interim Award finding in favor of NYCBS on the bulk of its claims.[3]    See id. at 30-32.    In relevant part, the Panel concluded that Caremark's MPR method for scoring patient adherence to oncology drugs was not "reasonable and relevant" in violation of both the AWPL and the parties' agreement.    Id. at 14.    As the Panel explained, witness testimony demonstrated that by utilizing the MPR to calculate NYCBS's performance score under the PNR program, Caremark "disregarded the inherent nature of oncology medications" by erroneously "assum[ing] that cancer patients will remain on drugs for a full calendar year" despite that the "high toxicity associated with such drugs may require a pause or discontinuance to avoid serious adverse effects."    Id. at 12.    In other words, "Caremark would deem the clinical decisions to hold or discontinue the [oncology] drugs to protect the patient's safety and quality of life/care as non-compliant and collect PNR fees" on that basis. Id.    On these findings, the Panel concluded that the application

---

[3] The Panel's award was only an interim award because it did not address attorneys' fees, which were addressed later in a final award that incorporates the interim award in full.    See Diskin Decl., Ex. 23.

of the MPR was not "reasonable and relevant" and thus contravened the AWPL's requirements and the parties' contractual obligations.[4] Id. at 14.

Additionally, the Panel sustained NYCBS's unjust enrichment claim because Caremark both misrepresented the terms of the PNR program and failed to deliver any bargained-for consideration to support the contract. Id. at 26-29. As to the misrepresentation, the premise of the PNR program was to reward NYCBS for good performance, but petitioners "knew that [they] could not develop criteria that [would] consistently and fairly measure adherence." Id. at 26 (cleaned up). Moreover, the Panel concluded that petitioners "understood that there was nothing NYCBS could do to improve its adherence score" but never informed NYCBS of this material fact. Id. Indeed, the Panel found that petitioners still, "to this day," have not provided NYCBS the full details of the MPR calculation. Id. at 27. One Caremark executive even referred to the MPR formula in his deposition as a "secret sauce."

---

[4] The Panel also found that petitioners' use of mean imputation to score adherence to non-specialty drugs violated the AWPL's "reasonable and relevant" standard and breached the parties' agreement. Interim Award at 14-17. As the Panel explained, "[m]ean imputation occurs when Caremark assigned pharmacies without any claims in non-specialty categories [such as NYCBS] an average performance score of other network pharmacies which had non-specialty claims." Id. at 14. Accordingly, "there was nothing NYCBS could do to increase its adherence score in the non-specialty category," which the Panel deemed neither "reasonable [nor] relevant." Id. at 15-16.

Id. at 12.  As the Panel summarized, petitioners "unfairly [tied] both of NYCBS' hands behind its back and [took] advantage of NYCBS' (and other providers') ignorance regarding how performance would be measured."  Id. at 28.

With respect to the lack of consideration, the Panel explained that "the consideration Caremark promised was financial reward tied to accurately measured individual performance," but such bargained-for consideration "was not delivered."  Id. at 29.  To the contrary, the only consideration that petitioners actually delivered "was a financial reward based on a flawed measurement criteria that, among other things[,] ignored the goal of promoting quality care for beneficiaries."  Id.  According to the Panel, petitioners' failure to deliver the bargained-for consideration "eviscerate[d] the very foundation of the contract, the basis for inducing NYCBS' agreement."  Id.

In light of these and other conclusions, the Panel awarded restitution to NYCBS in the amount of $17,082,162, which represented the full amount of PNR fees that NYCBS paid petitioners between 2016 and the date of the final arbitration hearing.  Id. at 30-31.  The Panel explained that "the application of the [PNR] program to NYCBS was unreasonable and unreliable" and could be "remedied only by a full return of PNR fees."  Id. at 31.

-12-

Furthermore, the Panel found that such an award was consistent with AAA Rule 47, which authorized the Panel to grant relief that it deemed "just and equitable." Id.

On September 19, 2023, the Panel issued its final award, which fully adopted and incorporated the interim award. See Diskin Decl., Ex. 23.

**4. The Petition**

On September 27, 2023, petitioners filed the instant petition to vacate the Panel's award, which found in favor of NYCBS on the majority of its claims. ECF No. 1. In support of their petition, petitioners filed a memorandum of law and a voluminous record spanning thousands of pages that included a significant portion of the evidentiary record and briefing from the underlying arbitration.[5] See ECF Nos. 17-18. On October 27, 2023, NYCBS filed an opposition to the petition to vacate and a cross-motion to confirm the Panel's award. See ECF Nos. 34-35, 38-39. On

---

[5] Prior to filing their petition to vacate, petitioners filed a motion for leave to file the case under seal; or, in the alternative, to seal petitioners' memorandum of law in support of their petition to vacate, as well as the evidentiary record and briefing from the arbitration; or, in the second alternative to redact proprietary information from the initiating documents in this matter. See No. 23-mc-351 (AS), ECF No. 1-1. After the parties fully briefed that motion, on November 30, 2023, the Court issued a Memorandum and Order denying petitioners' request and unsealing the case in its entirety. See ECF No. 11.

November 13, 2023, petitioners filed a reply in further support of
their petition to vacate and an opposition to NYCBS's cross-motion
to confirm the arbitration award.  See ECF Nos. 46-48.  Finally,
on November 20, 2023, NYCBS filed a reply in further support of
its cross-motion to confirm the award.  See ECF No 67.

## DISCUSSION

Because there is both a petition to vacate and a cross-motion
to confirm the arbitration award, we will address each of them
separately, beginning first with petitioners' petition to vacate.

## A. Petition to Vacate

"Vacatur of arbitral awards is extremely rare, and
justifiably so." Hamerslough v. Hipple, No. 10 Civ. 3056 (NRB),
2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012).  "To interfere
with the [arbitration] process would frustrate the intent of the
parties, and thwart the usefulness of arbitration, making it the
commencement, not the end, of litigation." Duferco Int'l Steel
Trading Co. v. T. Klaveness Shipping A/S, 333 F.3d 383, 389 (2d
Cir. 2003) (quotations omitted).  As such, "[i]t is well
established that courts must grant an arbitration panel's decision
great deference." Id. at 388.

Petitioners raise three distinct grounds to support their petition to vacate the arbitral award. Specifically, petitioners argue that the Panel (1) exceeded its authority by awarding NYCBS damages "that violated the plain terms of the parties' contract and exceeded NYCBS's reasonable expectations," (2) violated public policy in finding that NYCBS was a "pharmacy" within the meaning of the AWPL, and (3) manifestly disregarded the law in numerous respects, including for several of the same reasons that the Panel purportedly exceeded its authority and violated public policy. ECF No. 17 ("Pet.") at 12-13. We will address each of these arguments in turn.

## 1. Panel Exceeded Authority

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., "creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996) (quotations omitted). Section 10(a) of the FAA provides four grounds upon which a federal court may vacate an arbitral award:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the

controversy, or of any other misbehavior by which the rights
of any party were prejudiced; and (4) where the arbitrators
exceeded their powers, or so imperfectly executed them that
a mutual, final, and definite award upon the subject matter
submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

Of the four statutory grounds for vacatur, petitioners rely
solely upon the fourth, which provides that the court may vacate
an award "where the arbitrators exceeded their powers."  9 U.S.C.
§ 10(a)(4).  The Second Circuit has "consistently accorded the
narrowest of readings to the FAA's authorization to vacate awards
pursuant to § 10(a)(4)."  T.Co Metals, LLC v. Dempsey Pipe &
Supply, Inc., 592 F.3d 329, 342 (2d Cir. 2010) (quotations
omitted). When deciding whether an arbitrator exceeded his powers,
the inquiry "focuses on whether the arbitrators had the power,
based on the parties' submissions or on the arbitration agreement,
to reach a certain issue, not whether the arbitrators correctly
decided that issue." Banco de Seguros del Estado v Mut. Marine
Off., Inc., 344 F.3d 255, 262 (2d Cir. 2003).

"As long as the arbitrator is even arguably construing or
applying the contract and acting within the scope of his authority,
that a court is convinced he committed serious error does not
suffice to overturn his decision." United Paperworkers Int'l Union
AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987).  Indeed, "[i]t is

not enough for petitioners to show that the panel committed an error -- or even a serious error." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010). Rather, "[i]t is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." Id. (quotations and alterations omitted). In short, the court will uphold an arbitral award if the arbitrator offers even a "barely colorable justification" for the outcome reached. ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co., 564 F.3d 81, 86 (2d Cir. 2009).

Here, petitioners contend that the Panel exceeded its authority by awarding NYCBS what they call "windfall damages" of $17,082,162, which was a full return of all PNR fees NYCBS had paid since 2016. Pet. at 13-15. Specifically, petitioners argue that when NYCBS agreed to the terms of Caremark's PNR program, it "knew it would pay some PNR [fees]" even if NYCBS received the highest possible performance scores. Id. at 13. Therefore, according to petitioners, any damages should have been limited to the difference between the PNR fees actually paid and the fees that NYCBS would have paid had it received the highest possible performance scores (i.e., the minimum required PNR fee). Id. In

petitioners' view, by awarding NYCBS <u>all</u> the PNR fees it paid
Caremark since 2016, the Panel "ignore[d] the parties' contract"
and thus exceeded its authority.  <u>Id.</u>  For the reasons set forth
below, petitioners' argument is unavailing.

As an initial matter, it is worth noting that NYCBS did not
merely challenge the specific rate at which its PNR fees were being
assessed by Caremark.  Rather, NYCBS challenged the entire PNR
program (and its corresponding PNR fees) as unlawful and
unenforceable.  Indeed, NYCBS's third amended statement of claims
expressly sought a declaration "that Caremark's [PNR] Program is
unconscionable and therefore unenforceable."  Third Am. Statement
of Claims at 35.  Lest there any doubt, NYCBS also sought damages
up to $16,000,000, which, at the time, reflected the full amount
of PNR fees it paid since 2016 as a result of Caremark's PNR
program, not just the amount NYCBS would have paid had it been
subject to lowest possible fee permitted under the program.  <u>See</u>
<u>id.</u> at 36.  The Panel held in favor of NYCBS and refused to enforce
<u>any</u> of the terms of the PNR program in part because Caremark failed
to deliver the bargained-for consideration and thus "eviscerate[d]
the very foundation of the contract."  Interim Award at 29.

Accordingly, the Panel concluded that the "only" adequate remedy was an equitable one: "a full return of PNR fees." Id. at 31.[6]

In reaching this conclusion and awarding NYCBS the full amount of PNR fees as damages, the Panel acted well within the scope of its authority. When deciding whether an arbitrator exceeded the scope of his powers, the court need only determine that the arbitrator had the authority to decide the issue. See DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 824 (2d Cir. 1997). In this particular context of damages awarded by arbitrators, the question is not whether the Panel "properly awarded these damages in the case at bar" but rather whether the parties' arbitration agreement entrusted the Panel to "award [the disputed type of] damages generally." Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 220 (2d Cir. 2002); see also Fellus v. Sterne, Agee & Leach, Inc., 783 F. Supp. 2d 612, 618-19 (S.D.N.Y. 2011) ("A party cannot successfully argue that the arbitrators exceeded their authority to award damages where the party did not dispute the arbitrators' authority to award damages generally, but only that they did not properly award damages under the specific facts

---

[6] It bears noting that Federal Rule of Civil Procedure 54(c) allows a court to "grant any relief to which a prevailing party is entitled, whether or not that relief was expressly sought in the complaint." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 86 (2d Cir. 2004), opinion corrected, 511 F.3d 238 (2d Cir. 2004).

of the case."). Put simply, our inquiry turns solely on whether the parties' arbitration agreement permitted the arbitrators to award the form of damages that petitioners now contest.

"Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate." ReliaStar, 564 F.3d at 86. Applying this well-established principle, courts have consistently refused to vacate a wide range of damages awarded by arbitrators, including attorneys' and arbitrator's fees, see id., expectancy damages, see Westerbeke, 304 F.3d at 220, and even damages that purportedly violated a "limitation-on-damages provision" in the relevant agreement, Sutherland Glob. Servs, Inc. v. Adam Techs. Int'l SA de C.V., 639 F. App'x 697, 700 (2d Cir. 2016). In these cases, the damages award was deemed permissible because the parties' agreements vested broad discretion in the arbitrators and nothing in them expressly precluded the type of damages that the arbitrators ordered. As the Second Circuit summarized, "parties who wish to limit the scope of an arbitrator's [available remedies]" must "explicitly and clearly state that intent as part of their agreement to arbitrate." ReliaStar, 564 F.3d at 88.

Here, the parties' arbitration agreement is expansive and nothing in it expressly precludes the type of equitable damages

the Panel awarded.  The parties' agreement provides that "[a]ny and all disputes between Provider and Caremark . . . including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks" must be submitted to binding arbitration "pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures."  Diskin Decl., Ex. 14-C § 15.09 ("Arbitration Agreement").  This is a paradigmatic "broad" arbitration agreement.  See Ross v. Am. Express Co., 547 F.3d 137, 139 (2d Cir. 2008) (holding arbitration clause providing that "[a]ny dispute, claim, or controversy . . . arising out of or relating to this Agreement" must be settled in an arbitral forum was broad).  Moreover, under AAA Rule 47, which was incorporated into the parties' agreement, arbitrators are authorized to "grant any relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties."  Diskin Decl., Ex. 28.  Between the parties' broad arbitration agreement and the agreement's incorporation of Rule 47, there is little doubt the Panel had ample "discretion to order such remedies as [it] deem[ed] appropriate."  ReliaStar, 564 F.3d at 86.

In addition to vesting the Panel such discretion, nothing in the parties' agreement, expressly or otherwise, limited the Panel

from awarding the equitable relief it did.   Indeed, the only remedies the agreement explicitly prohibits are "indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by Law."   Arbitration Agreement.   Petitioners do not advance any argument, nor could they, that this language precluded the Panel from awarding NYCBS the relief it did.   Therefore, the Panel was acting safely within the bounds of its authority when it awarded NYCBS the full amount of PNR fees it had paid.

To resist this conclusion, petitioners chiefly argue that the Panel exceeded its authority because it "effectively deleted" the provision in the parties' agreement requiring NYCBS to pay a minimum PNR fee.   Pet. at 13.   However, petitioners misunderstand the applicable standard.   As discussed, the only question is whether the parties' arbitration agreement authorized the arbitrators to award the type of disputed damages generally, Westerbeke, 304 F.3d at 220, not whether the Panel's specific decision was at odds with other provisions in the agreement, Stolt-Nielsen S.A., 559 U.S. at 671 ("It is not enough . . . to show that the panel committed an error -- or even a serious error."). At bottom, what petitioners really contest is not whether the Panel

had authority to award equitable relief but whether it correctly determined the damages on the specific facts at hand.  This is not a ground for vacatur, Westerbeke, 304 F.3d at 220, and petitioners' argument has been expressly rejected by other courts that refused to vacate similar arbitration awards against Caremark, see Mission Wellness Pharmacy LLC v. Caremark LLC, 2023 WL 4136606 (D. Ariz. June 23, 2023); Caremark LLC v. AIDS Healthcare Found., 2022 WL 4267791 (D. Ariz. Sept. 15, 2022).  For these reasons, the Panel did not exceed its authority in granting NYCBS the damages it did.

### 2. Arbitral Decision Against Public Policy

In addition to the express statutory grounds found in § 10(a) of the FAA, a party may seek to vacate an arbitral award because it is contrary to public policy.  See Misco, 484 U.S. at 42-43. The public policy exception is "extremely limited," however, and the party moving to vacate must establish its existence.  Local 97, Int'l Bhd. Of Elec. Workers, A.F.L.-C.I.O. v. Niagara Mohawk Power Corp., 196 F.3d 117, 125 (2d Cir. 1999).  A reviewing court's authority to vacate on public policy grounds is restricted to "situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents

and not from general considerations of supposed public interests."
Misco, 484 U.S. at 43 (quotations omitted).

Here, petitioners argue that the Panel disregarded both CMS
and New York State Education Department (the "Education
Department") regulations by ruling that NYCBS is a "pharmacy"
covered by the AWPL. Pet. at 15. By way of context, the AWPL is
a federal statute that requires Part D prescription drug plans to
"permit the participation of any pharmacy that meets the terms and
conditions under the plan." 42 U.S.C. § 1395w-104(b)(1)(A). In
the arbitration, NYCBS's AWPL claim was based largely on Caremark's
alleged violation of an AWPL regulation, which provides that
contracts between CMS and Plan Sponsors must "have a standard
contract with reasonable and relevant terms and conditions of
participation whereby any willing pharmacy may access the standard
contract and participate as a network pharmacy." 42 C.F.R.
§ 423.505(b)(18). Before the Panel, petitioners argued that
because NYCBS is a "dispensing physician" rather than a "pharmacy,"
it could not assert an AWPL claim. Order No. 7 at 4. However,
the Panel rejected that argument in its preliminary Order No. 7,
holding that NYCBS is properly "defined as a pharmacy within the
meaning of the AWPL," id. at 6, and stating in its subsequent
interim award that it "sees no reason to revisit its earlier

-24-

determination," Interim Award at 10.  Petitioners contend that this ruling contravenes both federal and state regulations.  See Pet. at 15-18.  However, for the following reasons, we disagree and reject petitioners' argument.

### a. Federal Regulation

Petitioners first claim that CMS "has explicitly recognized" that AWPL does not apply to dispensing practitioners like NYCBS and that by holding otherwise, the Panel violated public policy. Pet. at 16-17.  However, far from establishing a "well defined and dominant" public policy that the Panel purportedly violated, Misco, 484 U.S. at 43, the authorities that petitioners cite in support of their argument only highlight the ambiguity and uncertainty around whether a dispensing practitioner can be deemed a "pharmacy."  Petitioners first cite a 2017 letter from CMS's chief administrator, which provides:

> While Part D sponsors are only required to contract with pharmacies, we are aware that some Part D sponsors have contracts with physician practices, including oncology practices, that are authorized by States to dispense prescription drugs.  Current guidance is silent on the issue of inclusion of non-pharmacy dispensing sites in Part D networks.  In light of changes to the pharmaceutical dispensing and distribution landscape since the inception of the Part D program, CMS is currently evaluating the role of non-pharmacy dispensing sites in the Medicare Part D program and is committed to working with stakeholders as we consider

> any possible changes to the existing regulations or guidance
> going forward.

Diskin Decl., Ex. 29.  Even assuming this letter has anything more
than mere persuasive value, the statement that "[c]urrent guidance
is silent" on this issue directly undercuts petitioners'
contention that CMS has "explicitly recognized" that AWPL does not
apply to dispensing practitioners like NYCBS.  Moreover, that CMS
acknowledged it was in the process of re-evaluating existing Part
D regulations only underscores that this question -- whether
dispensaries like NYCBS constitute a pharmacy -- was and remains
in a state of flux and thus precludes any inference that CMS had
embraced a "well defined and dominant" public policy that the Panel
violated.  <u>Misco</u>, 484 U.S. at 43.

Petitioners next rely on CMS statements in a 2018 final rule
in which CMS declined to issue any rules in response to comments
requesting that it "expand [its] definition of 'network pharmacy'
and interpretation of 'any willing pharmacy' to include dispensing
physicians."  Pet. at 17 (quoting 83 Fed. Reg. 16440-01 at 16593).
However, after placing CMS's statement in the broader context of
the rule, it becomes clear that CMS did not intend to make any
sweeping change to its treatment of dispensing providers in the
Medicare Part D landscape.  <u>See</u> <u>Rock of Ages Corp. v. Sec'y of
Labor</u>, 170 F.3d 148, 155 (2d Cir. 1999) (stating that in construing

a statute or regulation, we must "read that statute or regulation as a whole"). To the contrary, the relevant part of the rule petitioners cite was strictly and expressly limited to addressing the definitions of "retail pharmacy" and "mail-order pharmacy." See 83 Fed. Reg. 16440-01 at 16592. Indeed, in response to the comments requesting clarification on whether dispensing physicians could be characterized as pharmacies, CMS stated that such comments "are outside the scope of this rule." Id. at 16593. Therefore, in deeming NYCBS a pharmacy for purposes of the AWPL, the Panel did not violate any federal regulation warranting vacatur.

### b. New York Regulation

Petitioners separately argue that the Panel violated the New York Education Department's regulatory authority because the Medicare statute defers to individual states on licensing issues, 42 U.S.C. § 1395w-112(g) (incorporating 42 U.S.C. § 1395w-26(b)(3)), and New York state does not recognize dispensing practitioners like NYCBS as pharmacies, Pet. at 17-18. To support this contention, petitioners rely almost exclusively on arguments made by the Education Department in its ongoing litigation against NYCBS relating to Medicaid reimbursements. See id. Specifically, the Education Department has asserted in that case that "[a] practitioner who dispenses drugs to their patients is not

-27-

considered a pharmacy under statutory and enrollment requirements." Diskin Decl., Ex. 31 at 5. However, there are several obvious flaws in petitioners' reliance on statements made in that and other litigations.

First, the Education Department litigation involves Medicaid, not Medicare, which is the only program at issue here. See ECF No. 46 ("Reply Br.") at 5. To be sure, petitioners contend that NYCBS's license status "is the same regardless of whether it dispenses drugs for Medicaid or Medicare beneficiaries." Id. Even still, petitioners have not explained how New York's licensing regime interacts with administration of Medicare Part D, which is governed by CMS. Moreover, given that Caremark itself has continued to treat dispensing practices as pharmacies for purposes of Part D participation "[b]ased on ongoing dialogue with CMS," the federal authority, it would appear that Caremark adheres to CMS's definitions rather than any definition set forth by New York's State Education Department.[7] Levitt Decl., Ex. F.

Second, and more importantly, the representations on which petitioners rely were almost all made by New York state in submissions in an ongoing litigation. Pet. at 17-18. As

_____

[7] For these reasons, the Court is unpersuaded by purported admissions NYCBS has made here and in other litigations that it is not a "licensed pharmacy" under New York law. Reply Br. at 5.

discussed, an arbitrator's award is vacated only if it violates some "explicit public policy" that is "ascertained by reference to the laws and legal precedents." Misco, 484 U.S. at 43 (emphasis added). Assertions made in complaints and legal briefs can hardly be considered "laws and legal precedents" that form the basis of a well-defined public policy. If anything, the ongoing litigation between NYCBS and the Education Department relied on by petitioners is further evidence that a dispensing physician's place in the Medicare Part D framework remains unsettled and disputed.

In addition to these points, it bears mentioning that New York law expressly permits oncologists to dispense drugs. N.Y. Educ. L. § 6807(2)(a)(9). Although that still may not qualify NYCBS as a pharmacy under statutory requirements, see Reply Br. at 5, oncologists' ability to dispense drugs under New York law may explain why Caremark has permitted NYCBS to participate in its pharmacy networks for nearly a decade. Indeed, the Panel's finding that NYCBS was a pharmacy for purposes of the AWPL was based in part upon contract documents showing that Caremark "consistently referred to [NYCBS] as a 'pharmacy.'" Order No. 7 at 4. Ultimately, it was the "relationship of the parties here" that led the Panel to conclude that NYCBS "should be defined as a pharmacy within the meaning of the AWPL." Id. at 6. In making that

determination, for the reasons discussed above, the Panel did not violate "well defined and dominant" public policy -- at the federal or state level -- that could be ascertained by reference to "laws and legal precedents." <u>Misco</u>, 484 U.S. at 43. Therefore, we deny petitioners' request for vacatur on public policy grounds.

### 3. "Manifest Disregard" of the Law

Finally, in addition to the express statutory grounds found in § 10(a) of the FAA and the violation of public policy, there is an implied basis for vacatur where an arbitrator's award is in "manifest disregard" of the applicable law. <u>Duferco</u>, 333 F.3d at 388-89. However, this is a "doctrine of last resort." <u>Id.</u> at 389. Arbitral awards are vacated on this basis only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." <u>Id.</u> To determine whether such impropriety is apparent, the Second Circuit engages in a multi-step analysis. First, the reviewing court must find that the arbitrator ignored clearly defined law that was "in fact explicitly applicable to the matter before" him. <u>T.Co Metals</u>, 592 F.3d at 339. "[M]isapplication of an ambiguous law does not constitute manifest disregard." <u>Id.</u> Second, the court must find that the applicable law was "in fact ignored or improperly applied, leading to an erroneous outcome." <u>Id.</u> "Even where explanation

for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." Id. Under this analysis, the court may not vacate an arbitration award based on a "simple error in law or a failure by the arbitrator[] to understand or apply it" but rather only when the arbitrator "intentionally defied the law." Duferco, 333 F.3d at 389, 393.

Petitioners contend that the Panel manifestly disregarded the law by (1) ruling that NYCBS's AWPL claim had merit; (2) ruling that NYCBS prevailed on both its breach of contract and unjust enrichment claims; (3) awarding NYCBS "windfall damages"; and (4) consolidating the claims of multiple NYCBS dispensaries into a single arbitration proceeding. Pet. at 19-24. Each of these arguments will be addressed in turn.

### a. AWPL Claim

Petitioners' argument regarding the AWPL claim comes in several subparts. As a threshold matter, petitioners contend that the Panel disregarded the law when it concluded that NYCBS is a "pharmacy" within the meaning of the AWPL. Pet. at 23. For the same reasons set forth in our discussion above in rejecting petitioners' public policy argument, that argument lacks merit.

Next, petitioners assert that the Panel disregarded both Arizona and New York law by allowing NYCBS to proceed with a breach of contract claim based on an alleged violation of the AWPL, a federal law that provides no private cause of action. Pet. at 19-20. In reaching this conclusion, the Panel relied on Trone Health Services, Inc. v. Express Scripts Holding Co., 974 F.3d 845 (8th Cir. 2020). In Trone, the Eighth Circuit concluded that plaintiff pharmacies could base their breach of contract claims on a violation of Health Insurance Portability and Accountability Act of 1996 ("HIPAA") even though HIPAA lacked a private right of action. Id. at 851-52. The Panel was persuaded by Trone's reasoning that a contrary holding "would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." Order No. 7 at 6 (quoting Trone, 974 F.3d at 851 n.4).

Petitioners assert that the Panel erred in following Trone because that case is "distinguishable" in that in Trone, HIPAA was "directly referenced" in the parties' contract, whereas here, the AWPL is not. Pet. at 20. As a factual matter, that does not seem to be the case. Indeed, according to the Panel, "Caremark concede[d] that it follows the AWPL based on contractual obligations to its plan sponsor clients, including Silverscript

and Aetna." Order No. 7 at 4; see also id. at 6 (finding that "Caremark is contractually bound to follow the AWPL."). Pursuant to applicable regulations, moreover, entities including Caremark are required to "specify" in "[e]ach and every contract" that they "must comply with all applicable Federal laws, regulations, and CMS instructions," 42 C.F.R. § 423.505(i)(3)(iv), which necessarily encompasses the AWPL, suggesting that the AWPL, like HIPAA in Trone, was directly referenced in the parties' agreement.

Regardless of whether Trone is factually distinguishable on this basis, as a legal matter, the direct reference to HIPAA had little, if any, impact on the Eighth Circuit's holding in Trone. As discussed above, what motivated the Eighth Circuit's decision was not the specific language of the parties' contract but rather the concern that a contrary outcome would entirely preclude plaintiffs from seeking relief whenever Congress does not provide a remedy under federal law. See Trone, 974 F.3d at 851 n.4. The Panel's conclusion was similarly animated by this precise concern, and therefore we cannot say that the Panel erred in relying on the Eighth Circuit's decision in Trone.

However, even if we were to agree with petitioners that the Panel's misread Trone, that would still be insufficient to vacate the Panel's award. As noted, it is well-established that "the

interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation." Duferco, 333 F.3d at 388 (emphasis omitted). Accordingly, courts have refused to find a manifest disregard of law even where an arbitrator "misread[] or overlook[ed]" case law precedent, Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd., 888 F.2d 260, 268 (2d Cir. 1989), and where an arbitrator arguably "erred in resolving [] conflicting precedent," Goldman Architectural Iron Co., 306 F.3d 1214, 1217 (2d Cir. 2002). Thus, the Court certainly cannot conclude that the Panel manifestly disregarded the law simply by relying on the Eighth Circuit's decision in Trone.

In addition to their Trone argument, petitioners claim that New York and Arizona law "expressly prohibit common-law claims based on the violation of statutes containing no private rights of action." Pet. at 20-21 (citing cases). However, petitioners' reliance on a smattering of cases involving disparate federal statutes, none of which involve the specific statute (or regulation) at issue here, is simply not enough to demonstrate that the Panel ignored clearly defined law that was "in fact explicitly applicable to the matter before" it. T.Co Metals, 592

F.3d at 339.  As such, petitioners' AWPL private right of action argument fails.

The final subset of petitioners' argument regarding the AWPL claim centers on the Medicare Act's noninterference clause.[8]  Pet. at 21-23.  The noninterference clause provides that Human and Health Services ("HHS") and CMS "may not interfere with the negotiations between drug manufacturers and pharmacies and PDP sponsors."  42 U.S.C. § 1395w-111(i)(1).  In the arbitration, the parties vigorously disputed the impact of the noninterference clause and its interplay with the AWPL.  On the one hand, NYCBS argued that the noninterference clause does not prevent CMS from requiring, by way of the AWPL, that reimbursement rates are "reasonable and relevant."  See Order No. 7 at 5.  On the other hand, petitioners argued that this interpretation renders the noninterference clause "a nullity" -- the AWPL may require "reasonable and relevant" terms and conditions to ensure access, but it does not require such terms and conditions for reimbursement. Diskin Decl., Ex. 24 at 7.  Ultimately, the Panel "disagree[d] with [petitioners'] interpretation of the Non-

---

[8] As petitioners note, in 2022, Congress passed the Inflation Reduction Act, which modified the noninterference clause, but those changes do not affect the analysis here given the time frame at issue in the arbitration.  See Pet. at 21 n.1.

Interference Clause and [found] that there is an obligation under the AWPL to provide 'reasonable and relevant' terms and conditions to providers."  Order No. 7 at 6.

Petitioners assert that this ruling constitutes a manifest disregard of the law.  Pet. at 21-23.  In support of this contention, petitioners largely rehash the same arguments about the noninterference clause that they made to the Panel.  Compare Diskin Decl., Ex. 24 at 7-8, with Pet. at 21-23.  For example, petitioners cite HHS and CMS comments in final rules stating that neither agency has the "authority to . . . mandate that Part D plans negotiate the same, or similar reimbursement rates with all pharmacies," 70 Fed. Reg. 4194-01 at 4255, or to serve as "the arbiter of the adequacy of reimbursement methodologies," 79 Fed. Reg. 29844-01 at 29876.  If these were the only relevant statements HHS and CMS had ever made on this issue, then petitioners might satisfy the first prong of the manifest disregard test: that the law that was purportedly ignored was "clear."  T.Co Metals, 592 F.3d at 339.  However, that is not the full story.

On the other side of the ledger, as NYCBS pointed out in the arbitration and does so again now, CMS itself has said that the noninterference clause does not prevent it from "requir[ing] the inclusion of terms and conditions in agreements when necessary to

implement requirements under the Act." 79 Fed. Reg. 1918-01 at 1971. As CMS explained in that same regulation, Congress charged CMS with enforcing numerous contractual requirements, including, but not limited to, "[i]nterpretation of what 'access to negotiated prices' means, any-willing-pharmacy standard terms and conditions, prohibition on any requirement to accept insurance risk, prompt payment, and payment standard update requirements." Id. (emphasis added). According to NYCBS, this presumably comprises the ability to require "reasonable and relevant" reimbursement rates. ECF No. 38 ("Opp.") at 19-20; Order No. 7 at 5.

The Court certainly recognizes the possible tension between NYCBS's position, which the Panel adopted, and the language and purpose of the noninterference clause. However, the citations relied on by NYCBS demonstrate that there is far more than merely a "barely colorable justification" for the outcome the Panel reached. T.Co Metals, 592 F.3d at 339. Under the highly deferential "manifest disregard" standard, that is all that is required to avoid vacating the Panel's award. See id.

Petitioners further suggest that the Panel manifestly disregarded the law by holding petitioners liable for violating the AWPL because "HHS and CMS are ultimately responsible for

-37-

enforcing the AWPL."[9]  Pet. at 22.  For support, petitioners cite two CMS rules, the first of which states, in response to comments about the "reasonable and relevant" standard, that CMS "reserve[s] the right to review all contracting terms and conditions and investigate complaints regarding compliance with [its] rules." Id. (quoting 83 Fed. Reg. 16440-01 at 16592).  In the second rule, CMS explained that "Part D sponsors and pharmacies do not have the sole discretion to interpret," among other things, "any-willing-pharmacy standard terms and conditions."  Id. (quoting 79 Fed. Reg. 29844-01 at 29874).  Even taken together, these statements by CMS do not say nearly as much as petitioners claim they do. Essentially, they provide that while Plan Sponsors and providers are free to negotiate and interpret the terms of their contracts, CMS retains the ultimate authority to review those terms, investigate complaints, and enforce the relevant requirements. This is entirely consistent with other CMS guidance cited by NYCBS, which provides that "whether a Part D sponsor has permitted a pharmacy an opportunity to participate in its network" pursuant to reasonable and relevant terms and conditions is a "fact-specific question[] that [is] generally best left between the parties."

---

[9] In their reply brief, petitioners make a cursory reference to preemption. Reply Br. at 9.  Because that argument was raised for the first time on reply, and is not fully fleshed out, the Court will not consider it.

Levitt Decl., Ex. G at 6.  Thus, on this issue, too, the Panel had much more than a "colorable justification" for the outcome it reached.  T.Co Metals, 592 F.3d at 339.  Accordingly, for these reasons, we reject petitioners' arguments regarding the manifest disregard of any law relating to the AWPL claim.

### b. Unjust Enrichment

Next, petitioners argue that the Panel manifestly disregarded the law by ruling that NYCBS prevailed on both its breach of contract and unjust enrichment claims.  See Pet. at 23-24. Petitioners cite several cases, under both New York and Arizona law, standing for the proposition that the existence of a contract precludes a claim of unjust enrichment.  See id. (citing cases). Faced with the same argument, the Panel explained that:

> While unjust enrichment cannot be used to contradict the express terms of a contract, it can be used to provide restitution where there is a showing that [petitioners were] enriched at NYCBS's expense through the operation of some unjust factor such as mistake, duress, misrepresentation, or failure of consideration.  Given Caremark's conduct, two such unjust factors are operative on these facts: misrepresentation and failure of consideration.

Interim Award at 28.  On this basis, as discussed earlier, the Panel awarded "restitution to NYCBS of the full amount of the PNR fees assessed by [petitioners]."  Id. at 30.  Although the Panel

may have blurred legal concepts, the thrust of its holding was entirely supported by both New York and Arizona law.

At the outset, petitioners are correct that the existence of a written agreement generally precludes a claim of unjust enrichment. See Petrello v. White, 412 F. Supp. 2d 215, 233 (E.D.N.Y. 2006) ("New York Courts and the Second Circuit have consistently held that the existence of a written agreement precludes a finding of unjust enrichment." (quotations omitted)); Brooks v. Valley Nat'l Bank, 548 P.2d 1166, 1171 (Ariz. 1976) ("[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.").

That said, while a claim of unjust enrichment may be unavailable where a contract exists, the remedy of rescission is available despite the existence of a contract, albeit in limited circumstances. See Septembertide Publ'g, B.V. v. Stein & Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989); Cnty. of La Paz v. Yakima Compost Co., Inc., 233 P.3d 1169, 1189 (Ariz. Ct. App. 2010) (explaining rescission is among the "remedies [that] are available for a breach of contract"). These circumstances include "fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in

-40-

the contract which substantially defeats the purpose thereof."
New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F.
Supp. 2d 325, 329 (S.D.N.Y. 2000) (quotations omitted).[10]  In
addition, "it is well-settled that rescission is an equitable
remedy which will not be granted unless Plaintiffs lack an adequate
remedy at law."  Id.; see also Standard Chartered PLC v. Price
Waterhouse, 945 P.2d 317, 345 (Ariz. Ct. App. 1996) ("Rescission
[is] an equitable remedy.").  Although rescission is often labeled
as a remedy, it is "less a remedy and more a matter of conceptual
apparatus that leads to the remedy."  Robinson v. Sanctuary Record
Grps., Ltd., 826 F. Supp. 2d 570, 575 (S.D.N.Y. 2011) (quotations
omitted).  "The effect of rescission is to declare the contract
void from its inception and to put or restore the parties to status
quo."  Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 165
(S.D.N.Y. 2014) (quotations omitted); see also Standard Chartered,
945 P.2d at 345.  Therefore, where rescission is deemed
appropriate, it is often accompanied by restitution damages.  See
United States ex rel. Taylor v. Gabelli, No. 03 Civ. 8762, 2005 WL

---

[10] Similarly, under Arizona law, "[r]escission will almost certainly be available
when the claimant seeks to escape from an agreement that was induced by the
other party's fraud or wrongdoing."  Tempe Woman's Club v. Loren, No. 1 CA-CV
22-0743, 2024 WL 244441, at *3 (Ariz. Ct. App. Jan. 23, 2024) (quoting
Restatement (Third) of Restitution and Unjust Enrichment § 54, cmt. b (2011)).
Moreover, "rescission is justified where a failure of consideration of an
essential part of a contract exists."  Hall v. Read Development, Inc., 274 P.3d
1211, 1219 (Ariz. Ct. App. 2012).

2978921, at *5 n.10 (S.D.N.Y. Nov. 4, 2005) (citing Dobbs, <u>Law of</u> <u>Remedies: Damages, Equity, Restitution</u> § 4.3(6) (2d ed. 1993)).

In addition to the situations where rescission is appropriate, restitution damages are also available "as an equitable remedy for repudiation or total breach of a contract." <u>Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n</u>, No. 07 Civ. 10407 (LBS), 2010 WL 4983179, at *3 (S.D.N.Y. Dec. 6, 2010); <u>see</u> <u>also</u> Restatement (Second) of Contracts § 373(1) (1981) ("[A] breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance."); <u>see Seitz v.</u> <u>Indus. Comm'n of Ariz.</u>, 911 P.2d 605, 609 (Ariz. Ct. App. 1995) (stating that both rescission and restitution require a "vital breach of contract, representing a substantial failure of consideration" (quotations omitted)).

Against this backdrop, it is evident that the Panel was acting in accordance with -- not in manifest disregard of -- both New York and Arizona law, in aiming to restore NYCBS to the position it was in prior to entering the agreement with petitioners. Indeed, the Panel concluded (and petitioners do not currently dispute) that petitioners induced NYCBS by way of

misrepresentations and failed to deliver any bargained-for consideration, thereby "eviscerat[ing] the very foundation of the contract." Interim Award at 29. Furthermore, the Panel determined (and again petitioners do not contest) that the "only" adequate remedy for NYCBS was a "full return of the wrongfully assessed PNR fees." Id. at 31. Whether viewed as rescission based on fraud in the inducement and failure of consideration or as a total breach of the parties' contract, New York and Arizona law clearly permit an award of restitution in such circumstances. Therefore, we cannot conclude that the Panel manifestly disregarded the law by granting NYCBS the full measure of PNR fees. See T.Co Metals, 592 F.3d at 339 ("Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case.").

### c. Windfall Damages

Petitioners next argue that the Panel manifestly disregarded the law by awarding windfall damages. Pet. at 24. However, we reject this argument for the same reasons we found that the damages award did not constitute a violation of the Panel's authority.

**d. Consolidation**

The final argument petitioners advance is that the Panel manifestly disregarded the law by consolidating the claims of multiple NYCBS dispensaries into a single arbitration proceeding, in violation of the arbitration agreement's anti-consolidation clause. Pet. at 24-25. That clause provides, in relevant part, that:

> [a]ll disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express permission of all parties to the Provider Agreement.

Arbitration Agreement. Based on this provision, petitioners argued during the arbitration that NYCBS must identify a single NYCBS pharmacy to continue this arbitration and that the Panel should sever and dismiss all other pharmacy claims as impermissibly consolidated.[11] See Order No. 7 at 11. After an expedited period of discovery on this and other issues, see Levitt Decl., Ex. H, the Panel rejected petitioners' argument because all the applicable agreements were signed by the same NYCBS employee and the various NYCBS locations were not distinct legal entities

---

[11] Presumably, this means that petitioners would have to defend against six separate but identical arbitration demands.

-44-

capable of suing or being sued, <u>see</u> Order No. 7 at 12.  Contrary to petitioners' contention, the Court does not find the Panel's determination to be a manifest disregard of the law.

As an initial matter, the clear intent of the consolidation clause is to prohibit class actions and joinder of unrelated entities in an arbitration.  Simply put, it says nothing about whether related parties like NYCBS's various dispensaries can bring a single action together.  Moreover, each NYCBS dispensing location is incorporated under the same tax identification number and has the same contract with Caremark, demonstrating that NYCBS was properly treated as a single party.  <u>See</u> Diskin Decl., Ex. 12.  As such, the Panel's interpretation of the consolidation clause is not only permissible, but it is also correct.

In any event, the question of whether to consolidate arbitration proceedings is, at its core, an exercise in contract interpretation.[12]  <u>See</u> <u>In re Arbitration Between Coastal Shipping Ltd. & S. Petroleum Tankers Ltd.</u>, 812 F. Supp. 396, 402 (S.D.N.Y. 1993).  This poses an additional obstacle for petitioners, and an

---

[12] This is distinct from the question of whether the court or an arbitrator should determine the threshold issue of consolidation.  <u>See, e.g.</u>, <u>Rice Co. v. Precious Flowers Ltd.</u>, No. 12 Civ. 0497 (JMF), 2012 WL 2006149, at *4 (S.D.N.Y. June 5, 2012) (citing cases).  Here, there is no dispute that the Panel -- not a court -- was empowered to make the consolidation determination.

insurmountable one at that.  As the Supreme Court has explained, "[b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." Misco, 484 U.S. at 37-38.  While the arbitrator "may not ignore the plain language of the contract," a reviewing court "should not reject [the] award on the ground that the arbitrator misread the contract." Id. at 38.  Here, even if the Panel did misinterpret the consolidation clause, which it plainly did not, the Court has no authority to second guess the Panel's determination in that respect.

The Court is also not persuaded by petitioners' argument that the Panel's decision was in manifest disregard of the law because it ignored Lamps Plus, Inc. v. Varela, 587 U.S. 176 (2019), Weyerhaeuser Co. v. W. Seas Shipping Co., 743 F.2d 635 (9th Cir. 1984), and Marbaker v. Statoil USA Onshore Props., Inc., 801 F. App'x 56 (3d Cir. 2020).  Pet. at 25.  Petitioners contend that those cases stand for the proposition that consolidated arbitrations must be based on "express contractual authority." Id.  However, those cases are readily distinguishable.  Both Lamps Plus and Marbaker involve class action proceedings, and Weyerhaeuser was a maritime case involving three separate

entities, one of which had an indemnification agreement with another. Therefore, there was no clearly defined law that was "in fact explicitly applicable to the matter before" the Panel. T.Co Metals, 592 F.3d at 339. Even if petitioners were correct that express authority were required by law, the Court can easily "infer[]" from the Interim Award that the Panel identified express authority in the parties' agreement to consolidate the proceedings into one arbitration. Id. Accordingly, we reject petitioners' argument that the Panel's consolidation determination constituted a manifest disregard of law.[13]

## B.  Cross-Motion to Confirm

Finally, we must consider NYCBS's cross-motion to confirm the Panel's award. Under the FAA, "any party to [an] arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. "Only a barely colorable justification for the outcome reached by the arbitrators is

---

[13] Another district court rejected the same consolidation argument petitioners advance here. See Caremark LLC v. AIDS Healthcare Found., 2022 WL 4267791, at *7 ("The Court therefore rejects Caremark's argument that the arbitrator manifestly disregarded the law when he resolved the [provider's] claims in a single proceeding.").

necessary to confirm the award." <u>D.H. Blair & Co., Inc. v. Gottdiener</u>, 462 F.3d 95, 110 (2d Cir. 2006) (quotations omitted). "Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter." <u>First Cap. Real Estate Invs. LLC v. SDDCO Brokerage Advisors, LLC</u>, 355 F. Supp. 3d 188, 196 (S.D.N.Y. 2019). As explained above, petitioners have not provided any basis on which to vacate, modify, or correct the Panel's award, and there is far more than a colorable justification for the award. Therefore, NYCBS's cross-motion to confirm the award is granted, and the award is confirmed.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court denies petitioners' petition to vacate, grants NYCBS's cross-motion, and confirms the Panel's arbitration award. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 16 and close the case.

**SO ORDERED.**

Dated:    New York, New York
          July 15, 2024

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE